UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

ROSENBLAD DESIGN GROUP, INC.,            )
                                         )
            Plaintiff,                   )
                                         )
v.                                       )      No.:    3:20-cv-511-TAV-JEM
                                         )
KNOXVILLE STRUCTURAL                     )
STEEL, INC.,                             )
                                         )
            Defendant.                   )

## <u>MEMORANDUM OPINION</u>

This matter is before the Court following a five-day bench trial on plaintiff's, Rosenblad Design Group, Inc. ("Rosenblad"), breach of contract, breach of warranty, negligence, and exaggerated lien claims against defendant Knoxville Structural Steel ("KSS"), as well as KSS's counterclaim against Rosenblad for breach of contract and quantum meruit.

After giving careful consideration to the testimony of the witnesses [Doc. 71], the exhibits introduced at trial [Doc. 83], the transcripts of the proceedings [Docs. 74–78], the proposed findings of fact and conclusions of law [Docs. 80, 82], the post-trial briefs [Docs. 79, 81], and the applicable law, the Court herein makes its findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a) ("In an action tried on the facts without a jury . . ., the court must find the facts specifically and state its conclusions of law separately.").

## I.     Procedural History

On January 10, 2023, the Court denied Rosenblad's motion for partial summary judgment on Rosenblad's breach of contract claim [Doc. 47], holding that KSS breached the parties' agreement by failing to timely (1) complete detailing work and (2) deliver the steel to the Project site.  The Court's ruling was based on KSS's responses to requests for admission wherein KSS admitted that it failed to complete detailing and deliver the steel in accordance with the deadlines set forth in the parties' agreement.  However, the Court determined there was a genuine dispute of material fact as to whether Rosenblad waived its right to terminate the parties' agreement under the "time is of the essence" provision.

Thereafter, this case proceeded to trial, which began in November 2023 and concluded in December 2023.  Rosenblad presented three witnesses: Jan Fredrik Thelander, Rosenblad's Chief Executive Officer [Doc. 74, p. 25]; Tanya Dishner of W.G. Yates & Sons Construction ("Yates") [Doc. 75, p. 130]; and expert witness Kelly Pettersen of FTI Consulting, Inc. [Doc. 76, pp. 171–72].  KSS presented two witnesses: Anthony Weaver, president of KSS [Doc. 78, p. 5], and expert witness David Chapman of Construction Engineering Consultants [Doc. 77, p. 110].

## II.    Findings of Fact

### A.     Overview of the Project and the Parties' Obligations as Originally Planned

1.     Rosenblad initially was contracted by Yates to design and build an evaporator system for the Vonore Fiber Products Facility Project (the "Project") in Vonore, Tennessee [Doc. 74, pp. 26–28].

2

2.      On February 18, 2020,[1] Rosenblad subcontracted with KSS to fabricate and furnish the structural steel ("PO-1") for the Project in exchange for $150,820.49 [Doc. 63 ¶ 1; Pl. Ex. 2; Def. Ex. 2].

3.      PO-1 provided, in pertinent part, the following terms:[2]

   a.      "[T]ime and rate of deliveries are the essence of this order" [Doc. 63 ¶ 2].

   b.      "By accepting this order, [KSS] warrants that the articles are free from defects in materials, workmanship and fabrication, and that all merchandise delivered shall be of the quality, quantity, size, description, and dimensions specified and shall be strictly in accordance with [Rosenblad]'s specifications, drawings, and approved sample, if any, and suitable for the purpose designated. These warranties shall survive acceptance and payment, and shall run to [Rosenblad], its successors and assigns, and shall not be deemed to be exclusive" [Id. ¶ 28; Pl. Ex. 2 ¶ 7; Doc. 74, p. 34].

   c.      "[Rosenblad] shall have the right at any time to set-off any amount owing by [KSS]," to allow for Rosenblad to recoup any costs associated with back charges assessed to Rosenblad" [Pl. Ex. 2 ¶ 10; Doc. 74, p. 35].

   d.      "Failure of [Rosenblad] to insist upon strict performance of any condition of this order shall not constitute a waiver of such condition or waiver of any default" [Pl. Ex. 2 ¶ 18; Doc. 76, p. 115].

4.      PO-1 set forth the following schedule:

Detailing completed [by KSS] by or before March 5, 2020
Approvals [by Rosenblad] back by March 19, 2020
Delivered and furnished [by KSS] by or before May 7, 2020

---

[1] Unless otherwise noted, all subsequent dates herein occurred in 2020.

[2] PO-1 provides that it shall be governed by Florida law [Pl. Ex. 2; Def. Ex. 2]. However, both at the summary judgment stage, and the post-trial stage, the parties have both asserted that Tennessee law governs PO-1 [*see, e.g.*, Doc. 47, p. 7 n.2; Doc. 80, pp. 16, 18; Doc. 82, p. 20]. As a result, the Court will construe PO-1 under Tennessee law [See Doc. 47, p. 7 n.2 (construing PO-1 under Tennessee law for summary judgment purposes).

3

> Grace Period for Liquidation Damages to May 14, 2020
> Then, $1,500.00 per day for damages starting on May 15, 2020

[Doc. 63 ¶ 3; Pl. Ex. 2; Doc. 78, p. 17].

5.      Upon executing PO-1, KSS began the process of preparing to fabricate the steel for the Project [Doc. 78, pp. 17–18].

6.      The first part of this process was "detailing," which required KSS to create "detail" or "shop" drawings [*Id.* at 7, 10, 18–19; Doc. 75, pp. 8, 19–20].

7.      Before KSS could begin detailing and create shop drawings, Rosenblad needed to provide KSS accurate "construction" or "design" drawings, which were created by Rosenblad or another third party [*Id.*].

8.      KSS was to produce "detail" or "shop" drawings based on the design drawings for Rosenblad's approval [*Id.*].

9.      The design drawings also enabled KSS to estimate the cost of fabrication and discern how much material it needed to purchase [Doc. 75, pp. 8–9; Doc. 78, pp. 5–6].

10.      Consistent with standard practice, PO-1 provided Rosenblad a two-week window after the detailing stage was complete to return approved shop drawings to KSS such that KSS could begin the fabrication process [Pl. Ex. 2; Doc. 78, p. 36].

11.      After KSS completed detailing and Rosenblad approved the shop drawings, KSS would order materials and begin the steel fabrication process [Doc. 78, p. 10; Pl. Ex. 2].

12.     KSS would not order material to begin the fabrication process without approved shop drawings from Rosenblad because of the risk that certain dimensions change, which could be costly [Doc. 78, pp. 7–8].

**B.     The Parties' Performance "As-Built"**

13.     On February 19, KSS subcontracted the detailing work under PO-1 to 3D Engineering Services, LLC ("3D") [*Id.* at 18; Doc. 74, pp. 35–36; *see also* Pl. Ex. 3; Doc. 63 ¶ 5].

14.     In doing so, KSS, while still responsible to Rosenblad for the detailing scope, did not perform actual detailing but facilitated the exchange of shop drawings among itself, 3D, and Rosenblad [Doc. 63 ¶ 5].

15.     A Request for Information ("RFI") is a process in which the detailer (in this case, 3D, through KSS) may ask questions or seek clarifications regarding a particular component or dimension of the design drawings, which necessitated a response from Rosenblad before the shop drawings could be finalized [Doc. 78, pp. 7–10, 13, 18, 28, 66, 72; Doc. 75, pp. 7–8, 12, 20].

16.     RFIs are common in design and construction projects, and not all necessarily result in scheduling delays on a given project [Doc. 77, pp. 9, 17–18; Doc. 78, p. 72].

17.     Three RFIs were issued during this Project [Doc. 75, pp. 7–8, 12; Doc. 78, pp. 13, 18, 66].

5

18.     On February 21, KSS presented the first RFI ("RFI 1") to Rosenblad, as 3D had questions and needed verifications regarding certain dimensions in the design drawings [Doc. 75, pp. 22–25; Def. Ex. 22; Def. Ex. 59].

19.     Among other issues, 3D observed that a column may have been left out of the design drawings and "need[ed] answer[s] ASAP in order to stay on track" [Def. Ex. 22].

20.     That column was a "main member" supporting the entire structure to which other members connected, and without confirmation from Rosenblad that the column was inadvertently omitted from the design drawings, KSS could not complete its detailing work [Doc. 78, pp. 22–23].

21.     Sometime before March 5, Rosenblad confirmed that the column and the attaching members thereto were omitted from the design drawings, which required KSS to create additional shop drawings [Doc. 75, p. 30].[3]

22.     Mr. Weaver testified that he never observed an engineer omit a main member from design drawings in his 38-year career [Doc. 78, p. 72].

23.     On February 27, 3D sent IFA E-Plans Evaporation Plant 2.27.20 (the "2.27 Drawings") to KSS, who forwarded them to Rosenblad the next day [Doc. 63 ¶ 7; Def. Ex. 23].

---

[3] It is unclear when exactly Rosenblad confirmed to KSS that the column was left out of the design drawings. Indeed, Rosenblad's expert, who was tasked with quantifying the delay on the Project, admitted that the evidence does not paint a "full picture" as to what information was provided to KSS and when with regard to RFI 1 [Doc. 77, p. 8].

6

24.     On February 28, 3D sent new and revised e-plans to KSS (the "2.28 Drawings") and instructed KSS to use the "2.28 Drawings" and ignore the 2.27 Drawings because 3D made "minor" changes to the 2.28 Drawings [Doc. 63 ¶ 8; Def. Ex. 25].

25.     KSS did not forward the 2.28 Drawings to Rosenblad until March 9, four days after the detailing deadline set forth in PO-1 [Doc. 63 ¶¶ 9, 12; Def. Ex. 25].

26.     Also on February 28, Rosenblad sent KSS a partial response to RFI 1 [Def. Ex. 22].

27.     On March 3, Rosenblad provided KSS with additional comments and detailing information in response to RFI 1, but noted there were "[a] couple things [it] couldn't answer yet and should have the answers tomorrow" [Def. Ex. 24].

28.     KSS did not have a complete response to RFI 1 until, at minimum, March 4, the day before the detailing deadline.

29.     Although Rosenblad's expert indicated that a final response was rendered on March 5 [Doc. 77, p. 88], the evidence does not conclusively establish when RFI 1 was resolved, although it appears it was resolved on March 4.

30.     KSS could not complete detailing until Rosenblad fully responded to RFI 1 [Doc. 75, pp. 28–29; Doc. 78, p. 25].

31.     Rosenblad's response time to RFI 1 impacted KSS's ability to timely complete detailing [Doc. 77, p. 89; Doc. 78, pp. 27, 35].

32.     KSS did not complete its detailing work by March 5 in accordance with the deadline established in PO-1 because KSS failed to return the 2.28 Drawings until March 9 [Doc. 63 ¶ 9; *see also* Doc. 47, pp. 12–13].

7

33.     However, even if KSS provided the 2.28 Drawings on or before March 5, detailing could not have been completed by that date.  As discussed *infra*, detailing continued through the end of April because of various oversights and mistakes made by Rosenblad [*see also* Doc. 78, p. 27; Doc. 77, p. 89].

34.     Moreover, the 2.28 Drawings could not have been the final shop drawings because they were created before Rosenblad provided KSS additional detailing information under RFI 1 [Doc. 78, pp. 33–34].  Put differently, KSS's untimely return of the 2.28 Drawings would not conclude KSS's detailing obligations under PO-1.

35.     On March 5, the parties reduced the amount of PO-1 to $143,279.37 [Doc. 63 ¶ 4].

36.     On March 6, Rosenblad asked KSS when it would provide detailing and requested that it provide any detailing work that was complete so that Rosenblad could begin the review process [*Id.* ¶ 10].

37.     Nonetheless, on March 6, Rosenblad issued a number of checks to KSS for its work on the Project in the following amounts: $12,000, $32,105.34, and $4,875.00 [Doc. 74, pp. 73–74; Pl. Ex. 21].

38.     On March 7, 3D observed that Rosenblad provided comments on the 2.27 Drawings instead of the 2.28 Drawings and told KSS that Rosenblad needed to verify the 2.28 Drawings, "since there are additional clouded dimensions" [Def. Ex. 25; Doc. 63 ¶ 11].

39.     On March 9, KSS sent the 2.28 Drawings to Rosenblad and stated that it "will stay on top of this to ensure no more time is lost" [Doc. 63 ¶¶ 9, 12; Def. Ex. 25].

8

40.     After the March 5 detailing deadline passed and KSS provided the 2.28 Drawings four days late, Rosenblad continued to perform in accordance with PO-1 by accepting, reviewing, and communicating about the shop drawings and design drawings with KSS [Doc. 78, pp. 27–29; Doc. 75, pp. 30, 32].

41.     Indeed, after March 5, Rosenblad wanted KSS to continue working on the Project [Doc. 75, p. 32; Doc. 78, pp. 27–28, 54].

42.     Rosenblad's conduct caused KSS to believe that Rosenblad wanted KSS to continue working on the Project [Doc. 78, p. 54].

43.     On March 18, KSS asked Rosenblad when it estimated the shop drawings would be approved [Def. Ex. 26], to which Rosenblad responded that it should "still be on track for 2 weeks from when [it] received the files from [KSS] on March 9," meaning March 23 [*Id.*].

44.     Rosenblad intended to provide approvals within two weeks after receiving the 2.28 Shop Drawings on March 9, consistent with the two-week timeframe allotted in PO-1 [Doc. 75, pp. 32–33; Doc. 78, p. 37; Doc. 82 ¶ 24].

45.     Also on March 18, Rosenblad sent KSS comments and markups on certain pages of the shop drawings [Pl. Ex. 9; Doc. 74, pp. 50–52]. Rosenblad told KSS it would have additional comments but wanted 3D to update the marked pages with certain missing details, as it would help Rosenblad check the remaining shop drawings [Pl. Ex. 9].

9

46.     Mr. Thelander recalled that the 2.27 Drawings were "not of the quality that we needed in order to get the job done" because they were missing detail, and recalled Rosenblad having "a lot of questions" on them [Doc. 74, pp. 38–39].

47.     While he could not recall any specific questions or issues with the shop drawings, he testified generally that he knew there were "questions and misconceptions and misunderstandings" [*Id.*].

48.     As to the March 18 email, Mr. Thelander testified that he did not know if the email referred to missing detail from the design drawings or shop drawings or if it was a combination of both, but he recalled it referred to issues that Rosenblad observed in reviewing the shop drawings [Doc. 76, pp. 17–19].

49.     On cross-examination, Mr. Thelander acknowledged that the March 18 email was ambiguous as to whether there was missing detail in the shop drawings or the design drawings [*Id.* at 18–19].

50.     Indeed, before March 18, it is undisputed there had been missing detail from the design drawings (i.e., the missing column that was discovered through RFI 1) [Doc. 75, p. 30].

51.     3D returned the updated shop drawings as requested by Rosenblad on March 18 by March 23 [Pl. Ex. 12].

52.     On March 20, Rosenblad sent approvals on a portion of the shop drawings [Doc. 74, p. 52; Doc. 75, p. 33; Pl. Ex. 10], and advised that it had "not checked the detailed drawings for the Stripper-Condenser handrails [and stripper condenser

platforms] since we feel many of these will need to be resubmitted based on our initial review of the drawings" [Pl. Ex. 10; Doc. 78, pp. 42–43].[4]

53.    Much like his testimony about the March 18 email, Mr. Thelander testified that the March 20 email demonstrates that Rosenblad observed problems in 3D's shop drawings, yet he conceded that the email does not say as much or specify whether Rosenblad's review was of the shop drawings or design drawings [Doc. 76, pp. 20–21].

54.    Indeed, the March 20 email did not attribute fault to KSS or 3D or claim the shop drawings were deficient or of a poor quality [Doc. 78, pp. 42–43].

55.    Rosenblad has maintained that problems with 3D's shop drawings caused a delay in its ability to return approvals.  In support, Rosenblad cites the March 18 and 20 emails and Mr. Thelander's trial testimony.  Yet Rosenblad did not introduce contemporaneous or credible evidence that indicates as much, or clarifies the ambiguous language in the March 18 and 20 emails.  The only such evidence in which Rosenblad attributed delay to KSS was an email on March 30 wherein it observed that KSS sent the 2.28 Drawings four days late—with no mention of the quality of 3D's shop drawings as a reason for the delay [Def. Ex. 30].

---

[4]    In its post-trial brief, Rosenblad vaguely claims the drawings could not be approved "because there were too many necessary changes" [Doc. 81, p. 5], though it does not specify what the changes actually were.  Indeed, Rosenblad's own ambiguity in describing the email seems to intimate that the email could have referred to problems with the design drawings, claiming the "issues with the drawings" led to RFI 2 [*Id.* at 7].

11

56.     Without further evidence, the Court is not persuaded by Mr. Thelander's vague testimony about the quality of 3D's shop drawings, as he admitted he could not recall specifics as to any particular deficiencies [Doc. 74, pp. 38–39].[5]

57.     Nor does the Court find that Mr. Thelander's testimony is corroborative evidence of the allegation that there were problems with 3D's shop drawings that caused delay.

58.     On the other hand, the undisputed evidence demonstrates that there were problems with and missing details in the design drawings.  More specifically, there were issues in the design drawings with the parts to which Rosenblad specifically called out in its March 20 email—the stripper condenser platform and handrails.  In fact, as would imminently become apparent through two additional RFIs, there were issues with the design drawings relating to the stripper condenser platforms and handrails, with certain members interfering and clashing with others, which required KSS to revise its shop drawings [Doc. 78, pp. 39–40, 45–47, 65–70; Def. Ex. 56; Def. Ex. 36; Def. Ex. 66; Doc. 75, pp. 46, 48].

59.     Further, the Court credits Mr. Weaver's testimony that, at the time, Rosenblad mentioned it observed issues with piping coming through the handrails and bracing in the stripper condenser platform [Doc. 78, pp. 42–43].

---

[5]     As discussed *infra*, Rosenblad's expert also relied on the ambiguous emails from March 18 and 20 to conclude that there were problems with the shop drawings.  Much like Mr. Thelander, Rosenblad's expert did not testify to any specific issues with the drawings, and it does not appear that she reviewed the shop drawings with missing detail to discern the delay impact.

60.     He also testified that Rosenblad never mentioned to KSS that 3D's shop drawings were the reason for its delay in approvals [*Id.* at 61–62].  The undisputed evidence corroborates his testimony.

61.     Considering the above, the Court finds it is just as plausible that Rosenblad provided additional detail for 3D to include in the shop drawings based on changes to the design drawings.

62.     Even if there were oversights in the shop drawings, based on the content of the emails and Mr. Thelander's testimony alone, the Court finds that the evidence does not preponderate in favor of finding that 3D's shop drawings were the primary cause of delays during the detailing and approvals stages of PO-1.

63.     Despite the claimed issues with the shop drawings, on March 20, Rosenblad issued another check to KSS for its work on the Project in the amount of $10,183.97 [Doc. 74, pp. 73–74; Pl. Ex. 21].

64.     Rosenblad did not return final approved shop drawings on March 23, two weeks after KSS sent the 2.28 Drawings on March 9 [Doc. 78, pp. 37–38].

65.     Nevertheless, after March 23, Rosenblad continued working with KSS to move the Project forward, providing KSS the information it needed to complete detailing such that Rosenblad could continue approving the shop drawings [*Id.* at 61].

66.     On March 26, Rosenblad received the second RFI ("RFI 2") [Def. Ex. 30, p. 3; Doc. 63 ¶ 13; Pl. Ex. 13; Doc. 74, p. 57; Doc. 75, p. 34; Def. Ex. 60].

13

67.    RFI 2 included questions about the stripper condenser platforms based on the design drawings, as 3D observed certain members, including a channel, interfering with piping [Doc. 78, pp. 45–47; Def. Ex. 56].

68.    On March 27, Rosenblad issued another check to KSS for its work on the Project in the amount of $10,183.97 [Doc. 74, pp. 73–74; Pl. Ex. 21].

69.    Also on March 27, Rosenblad indicated to KSS that Rosenblad should send a response to RFI 2 by Monday, March 30, but it did not send a response on March 30 [Doc. 63 ¶¶ 14–15].

70.    As of March 30, Rosenblad had not sent final approvals [Def. Ex. 30; Doc. 78, p. 48].

71.    On March 30, KSS informed Rosenblad that KSS was "falling behind on this project due to the lack of approved drawings. We still have not received the approve[d] drawings and we are now 12 days behind. The Contract [sic] promise date of approved drawings was on or before 3/19/2020. Today is 03/30/2020. We will need to ask you what are your suggestions. The delivery schedule (on or before May 7th, 2020) may be at a critical path at this point" [*Id.*].

72.    At the time, KSS was concerned that it could not meet the schedule and timely produce and deliver the steel [Doc. 78, pp. 48, 50, 80].

73.    Rosenblad responded, stating that it believed it would return approvals that day, though it ultimately did not [*Id.* at 51–52; Def. Ex. 30]. Rosenblad further observed, "[N]ot that it changes anything now but [3D] had drawings ready on 2/28 and 3/2 that we

14

didn't receive until 3/9 for review. Once we can make it through approval we can look at the schedule again" [*Id.*].

74.     In reply, KSS agreed that the parties should "look at the schedule" [Def. Ex. 30].

75.     The next day, on March 31, KSS asked Rosenblad when the shop drawings would be approved, and Rosenblad's engineering team believed around lunch, though Rosenblad would not return approvals until mid-April [Def. Ex. 31].

76.     On April 3 and April 9, Rosenblad issued two checks to KSS for its work on the Project, each in the amount of $10,183.97 [Doc. 74, pp. 73–76; Pl. Ex. 21].

77.     On April 4 and 7, 3D returned the main steel fabrication package and condenser area reapproval package to KSS, respectively, which were sent to Rosenblad on April 7 [Pl. Ex. 14].

78.     On April 14, KSS asked Rosenblad about the approvals, noting that it had fabricated all the smaller pieces it could and that the "owner is getting concerned about meeting the deadline" [Def. Ex. 32; Def. Ex. 33; Pl. Ex. 15; Doc. 78, p. 53].

79.     At that point, Mr. Weaver recalled that KSS was "trying to do anything we could just to keep something moving through the shop and producing a product," with approvals from Rosenblad still outstanding on the main members of the structure [Doc. 78, pp. 53, 62–63].

80.     On April 14, Rosenblad attempted to send KSS approvals, which were to "be issued for construction with the changes noted" [*Id.* at 55; Pl. Ex. 16; Doc. 63 ¶ 18; Doc. 75, p. 44; Doc. 74, pp. 63–64].

15

81.     KSS was not informed that the "changes noted" were occasioned because of problems with the shop drawings [Doc. 78, p. 55].

82.     RFI 2 was also remedied on April 14 [Pl. Ex. 16; *see also* Doc. 82 ¶ 27].

83.     The next day, on April 15, Rosenblad sent KSS revised approvals with markups and changes on three shop drawing sets because Rosenblad's engineer had mistakenly labelled the version that was sent on April 14 [Doc. 78, p. 56; Def. Ex. 36].

84.     Rosenblad informed KSS that "all remaining drawings" should be included and "[a]ll are approved with comments for issue to construction" [Def. Ex. 36].

85.     In light of the above, the Court finds that Rosenblad provided KSS substantially complete approvals on April 14 and 15 that enabled KSS to meaningfully proceed with the fabrication process on the main members.

86.     Mr. Weaver, who oversaw the fabrication process on the Project, testified that the ongoing changes to the shop drawings, as well as Rosenblad's return of approvals on the main members in mid-April, caused delays for KSS and impacted its ability to purchase materials and fabricate [Doc. 78, pp. 55, 62–63, 187].

87.     On April 17, KSS sent Rosenblad a third RFI ("RFI 3") after 3D observed additional conflicts in the design drawings, including handrails and certain members interfering with water piping on the stripper condenser platform [*Id.* at 65–70; Def. Ex. 36; Def. Ex. 66; Doc. 75, pp. 46, 48].

88.     Mark Lester, KSS's project manager, was authorized to make "major decisions" on the project on behalf of KSS [Doc. 78, pp. 186–87].

16

89.     Matt Mackie, procurement manager for Rosenblad [Doc. 74, p. 32], was involved in frequent back-and-forth communication with Mr. Lester about the Project.

90.     On April 17, following a telephone conversation, Mr. Lester emailed Rosenblad noting that the parties would meet on Monday, April 20, at which point KSS would give an update on the schedule "[b]ased on [its] performance over the weekend" [Def. Ex. 35]. Mr. Lester also stated, "If we have seen that the schedule is going to have to be extended or there is a need to have an increase in labor costs for overtime, Matt would talk with his team" [*Id.*].

91.     Rosenblad was aware that KSS was going to work over the weekend on April 18 and 19, but the evidence does not preponderate in favor of a finding that KSS would accrue overtime hours on such weekend work [*Id.*; Doc. 75, pp. 54–55].

92.     According to the April 17 email, KSS was going to report back after the weekend to discuss with Rosenblad whether, going forward, overtime on the Project would be necessary [Doc. 74, p. 67; Doc. 78, p. 176; Doc. 76, pp. 39, 136–37].

93.     Mr. Weaver recalled that KSS was going to see how much it could get done over the weekend and if there was going to be a need to add extra hours and labor on the Project [Doc. 78, pp. 64–65].

94.     Based on the April 17 email, KSS believes Rosenblad agreed to pay it overtime [*Id.* at 81–82, 216–17; *see also* Def. Ex. 6].

95.     On April 17, Rosenblad issued another check to KSS for its work on the Project in the amount of $10,183.97 [Doc. 74, pp. 73–74; Pl. Ex. 21].

17

96.     RFI 3 was resolved on April 20 and required KSS to modify the shop drawings, which in turn, required approval from Rosenblad [Doc. 78, pp. 70–72, 214; Def. Ex. 38]. As a result, detailing was ongoing in the latter-half of April because of mistakes occasioned by the design drawings.

97.     Around this time, Mr. Thelander acknowledged that both parties shared a mutual concern about the schedule [Doc. 76, p. 35].

98.     He also recalled that Rosenblad did not want to modify the schedule at this time, and that KSS was not asking for a schedule modification [Doc. 74, p. 65].

99.     On April 22, Mr. Lester emailed Mr. Mackie a "schedule update" memorializing a telephone "conversation" between the parties that occurred on or around April 20 [Pl. Ex. 17; Def. Ex. 41]. Specifically, he stated,

> 1) Complete steel package will ship to Galvanizer on 04/29/2020. Will be picked up at the galvanizer and delivered to the project site on 05/04/2020 with all fasteners.
> 2) Handrails and stairs will ship to galvanizer on 05/04/2020. Will be picked up from galvanizer on 05/11, 12, or 13/2020 and delivered to project site with grading.[6]
> 3) Will have pipe hangers quote[7] on 04/23/2020 [KSS] will have about $15,000.00 in overtime on project, we will talk more on 04/23/2020 will work together to try to resolve. . . .

[Pl. Ex. 17; Def. Ex. 41; Doc. 74, p. 65].

---

[6] The handrails and stairs were part of the "complete steel package" under PO-1 [Doc. 78, p. 79].

[7] The "pipe hangers quote" would become part of a second purchase order agreement between the parties, as discussed *infra* [Doc. 74, pp. 66–67].

18

100.   Mr. Weaver characterized the email as setting forth KSS's "tentative delivery dates" [Doc. 78, pp. 79–80].

101.   He did not believe the email was intended to be a written modification to PO-1 but rather reflected a telephone conversation between Rosenblad and KSS [*Id.* at 236–37].

102.   Mr. Thelander testified that Mr. Lester's statements in the April 22 email gave Rosenblad the expectation that KSS would deliver most of the steel to the Project site earlier than expected, which made Mr. Thelander "very happy" [Doc. 74, pp. 65–66]. He further testified that he was "happy" that the rest of the steel would be delivered before the liquidated damages provision was triggered on May 15 [*Id.* at 65–66].

103.   Indeed, the dates Mr. Lester provided in the April 22 email were within the grace period of PO-1 before the liquidated damages provision was triggered [Doc. 76, p. 36; Doc. 74, p. 66; Pl. Ex. 2].

104.   Yet, around that date, and despite the email, Mr. Weaver knew KSS could not meet the schedule but did not inform Rosenblad [Doc. 78, pp. 64, 79, 214–15].

105.   While KSS expressed concerns to Rosenblad about meeting the schedule before April 22, KSS did not request to modify or extend the schedule after Mr. Lester sent the April 22 email [*Id.* at 54, 105–06, 222–23].

106.   KSS did not introduce any evidence of its representatives communicating any scheduling concerns with Rosenblad after Mr. Lester's April 22 email.

107.   On April 23, Rosenblad informed KSS that Rosenblad's "[e]ngineering mistakenly marked up that [certain parts] weren't in [KSS's] scope. They should have

19

been as this mistook these for another pipe support [sic]. Please get these drawings over for approval on these" [Def. Ex. 42].

108.    The parts removed from KSS's scope included 10 stainless steel gusset plates [Doc. 78, p. 83; Doc. 76, p. 205; Def. Ex. 21].

109.    The mistake, which was not KSS's fault, required KSS to create additional shop drawings, which, in turn, required Rosenblad's approval [Doc. 75, pp. 51–52; Doc. 63 ¶ 20].

110.    Rosenblad caused a delay in KSS's ability to fabricate those stainless-steel gusset plates and timely deliver them to the Project site [Doc. 75, pp. 51–52; Doc. 78, pp. 87, 239].

111.    Mr. Weaver testified that KSS had trouble sourcing stainless steel, which was hard to come by during the COVID-19 pandemic [Doc. 78, p. 86; *see also* Def. Ex. 21].

112.    On April 30, 3D sent the additional shop drawings for the stainless-steel gusset plates [Def. Ex. 43], which demonstrates that, as of the end of April, KSS was still doing detailing work.

113.    The same day, Rosenblad returned the shop drawings with comments, which were "approved as noted" [Def. Ex. 44; Doc. 63 ¶ 21].

    C.    **Steel Deliveries under PO-1 and the Second Purchase Order**

114.    KSS did not deliver all items under PO-1 by May 4 or May 7 [Doc. 63 ¶¶ 23–24].

20

115.    On May 8, Rosenblad and KSS entered into a second purchase order agreement ("PO-2") in the amount of $31,110.00, pursuant to which KSS agreed to furnish pipe supports for the Project site on or before May 14 [*Id.* ¶ 25; Def. Ex. 3].

116.    Like PO-1, PO-2 provided that time of deliveries is of the essence [Doc. 63 ¶ 27; Def. Ex. 3].

117.    It also included the same warranty provision as PO-1 [Def. Ex. 3].

118.    Unlike PO-1, PO-2 did not contain a liquidated damages provision [Def. Ex. 3; Doc. 74, pp. 68–69].

119.    On May 8, 3D sent updated drawings for the parts that were mistakenly removed from KSS's scope with the requested changes by Rosenblad [Def. Ex. 44; Def. Ex. 46; Doc. 63 ¶ 22].  The same day, Rosenblad confirmed that 3D's shop drawings had all its requested changes [*Id.*].

120.    On May 14, Rosenblad notified KSS of a list of additional parts that Rosenblad needed to go to the galvanizer, along with other parts that were already slated to go to the galvanizer [Def. Ex. 61; Doc. 78, pp. 101–02].

121.    On May 21, after the May 14 delivery deadline in PO-2, Rosenblad notified KSS that two other pipe supports length under PO-2 had changed and needed to be modified [Def. Ex. 61; Doc. 78, pp. 101–02, 192–93; Doc. 78, p. 103].

122.    KSS furnished materials to the Project under PO-1 on May 12, 14, 21, 29, and June 3 and 13 [Doc. 63 ¶ 30].

123.    KSS delivered all the steel under PO-1 to the Project site by June 13, with the exception of the stainless-steel gusset plates that were mistakenly removed from its

21

scope under PO-1, which were delivered by July 8 along with other items under PO-2 [Doc. 78, pp. 99–100, 239–40; Def. Ex. 21; Doc. 76, pp. 62–63, 65–66, 69; Doc. 74, p. 95].

124. All materials under both PO-1 and PO-2 were delivered to the Project by July 8 [Pl. Ex. 34; Pl. Ex. 35].

### D. Quantifying the Delay

125. Rosenblad hired Ms. Pettersen to determine what delays on the Project were caused by each party [Doc. 76, p. 173].

126. In calculating and apportioning delay, Ms. Pettersen performed an as-planned versus as-built analysis by reviewing the Project records and documents to analyze and attribute any delay in the Project to the appropriate party [*Id.* at 174–75].

127. Of the 62 calendar days of delay calculated by Ms. Pettersen, she opined that KSS was responsible for 48 [*Id.* at 178; Pl. Ex. 80].

128. In calculating and apportioning delay on the Project, Ms. Pettersen claimed she considered and accounted for all activities under the Project, including delays occasioned in detailing, approvals, and ultimately delivery, because she explained that a delay of even one day at the very beginning could impact "everything downstream" [Doc. 76, pp. 181–82].

129. In its attempt to independently discern and understand Ms. Pettersen's report in the context of the evidence that was introduced at trial, the Court observes the difficulty in apportioning delay days among the parties in a case like this one, where the

basis for the apportionment is ambiguous, vague emails between the parties in which they were exchanging comments and changes on shop drawings.

130. Moreover, the Court notes as problematic the method in which Ms. Pettersen apportioned delay. She apportioned delay to Rosenblad based on affirmative evidence that demonstrated it caused delay, and after that, the remaining days were, seemingly by default, apportioned to KSS because there was no further evidence that Rosenblad caused delay.

131. Of the 32 delay days that she calculated in the detailing process, she apportioned 12 to Rosenblad for RFI 1 and RFI 2 [Doc. 76, pp. 178, 211, 217, 221; Pl. Ex. 80; Doc. 77, p. 15].

132. Ms. Pettersen's report does not provide a breakdown of those 12 days or explain what the 12 delay days were and why they should be apportioned to Rosenblad [*Id.* at 211, 221; Pl. Ex. 80].

133. Although her report does not cite to any of the RFIs or specifically detail their impact on the Project, Ms. Pettersen testified that they were considered in her analysis and report [Doc. 76, pp. 178, 211, 217, 221; Pl. Ex. 80; Doc. 77, p. 15].

134. Ms. Pettersen explained, based on her review of the Project documents, she believed Rosenblad was responsible for 12 delay days for RFI 1 and RFI 2 and apportioned those days accordingly; then, as the remaining Project documents did not reveal to her that Rosenblad caused any further delay, she apportioned the remaining 20 delay days to KSS [Doc. 76, pp. 179–80; Doc. 77, p. 16].

135. At trial, Ms. Pettersen explained that she apportioned delay to Rosenblad based on the RFIs in light of its average response time of three days [Doc. 77, pp. 89–90].

136. Specifically, she testified that RFI 1 impacted KSS's ability to complete detailing [*Id.* at 89]. Her testimony corroborates Mr. Weaver's testimony, noted *supra*, that Rosenblad's lack of response to RFI inhibited its ability to perform.

137. As to RFI 1, she apportioned 10 delay days to Rosenblad in light of its response time, from February 24 (excluding the first three days for its average response time) through March 5 [*Id.* at 18–19, 89].

138. She also testified that RFI 2 impacted KSS's ability to complete detailing and accordingly apportioned two delay days to Rosenblad [*Id.* at 87–90].

139. The extent of the delay that Ms. Pettersen apportioned to each party, particularly in RFI 2, is not supported by the evidence introduced at trial, and contradicts Rosenblad's own position on the matter.

140. When asked to account for the days of delay apportioned based on RFI 2, Ms. Pettersen testified that RFI 2 was issued on March 26 and responded to on March 31 [*Id.* at 87–90].

141. While Ms. Pettersen may have had the benefit of documentation that indicated RFI 2 was resolved on March 31 when compiling her report, Rosenblad did not introduce any evidence at trial to support that finding of fact.[8]

---

[8] KSS did not challenge Ms. Pettersen's testimony at trial, or in its post-trial briefing. Rather, the Court, in its efforts to determine when RFI 2 was resolved, discovered that there was no evidence introduced at trial to suggest that RFI 2 was resolved on March 31. As the Court found *supra*, the evidence introduced at trial indicates that RFI 2 was resolved on April 14.

142.    To the contrary, Rosenblad has taken the position in its post-trial briefing that RFI 2 was resolved on April 14, when it claims to have returned approvals [Doc. 82 ¶ 28].

143.    Using Ms. Pettersen's methodology, the delay attributable to Rosenblad for RFI 2 would begin on March 30 (3 days after it was issued to account for Rosenblad's average response time), and continue until April 14 or April 15, the days on which Rosenblad submits that it responded to RFI 2, for a total of 15 to 16 delay days.

144.    The evidence preponderates in favor of a finding that Rosenblad's contribution to the delay during the detailing and approvals stages was more extensive than KSS's.

145.    The Court also questions some of the inferences drawn by Ms. Pettersen in her report, including any apportionment of delay to KSS on the grounds that 3D provided shop drawings with missing detail and mistakes.  As justification for her conclusion that there were problems with 3D's shop drawings, Ms. Pettersen cites to ambiguous evidence: the March 20 email in which Rosenblad returned shop drawings to KSS and noted that it had not reviewed the stripper condenser platforms and handrails shop drawings [Doc. 76, pp. 198–99].  The circumstances of that email do not necessarily indicate there were problems with 3D's shop drawings.  Moreover, as noted *supra*, based on the March 20 email, the circumstances at the time suggest a more reasonable interpretation of the email: that Rosenblad did not review the shop drawings because it realized that there were problems with the design drawings relating to the stripper condenser platform and handrails, which soon would prove to be true.  Further, as the

25

Court concluded *supra*, there is no credible evidence that any problems or mistakes in the shop drawings were so extensive so as to substantially be the primary cause of the delays in detailing and approvals process.

146. Further, Ms. Pettersen was unable to specifically note or explain any errors in KSS's work, which suggests that she did not discern the extent of any such errors or whether any errors existed at all [Doc. 77, pp. 21–23].

147. In light of the above, to the extent that Ms. Pettersen attributed delay to KSS for mistakes in 3D's shop drawings, the Court questions how she could apportion any such delay without considering what the mistakes were and the impact on the Project. Put differently, why did she consider any such mistakes as delay events, rather than mere disrupters?

148. Moreover, the evidence preponderates in favor of a finding that Rosenblad substantially contributed to KSS's ability to complete detailing, which in turn delayed Rosenblad's ability to return approvals. The only credible and specific evidence of KSS's delay is that it returned the 2.28 Drawings four days late under PO-1. To the extent Rosenblad has attempted to shift blame for additional delay to KSS, the evidence does not preponderate in favor of such a finding.

149. At trial, Ms. Pettersen also was unable to recall the significance or impact of the mislabeling of the drawings that were approved on April 14 and resent on April 15 [*Id.* at 35].

150.    It was her opinion that Rosenblad caused no delay as a result of RFI 3, the mistaken labelling, and for mistakenly leaving parts out of KSS's scope, given Rosenblad's response time [*Id.* at 46, 48, 53, 90].

151.    Ms. Pettersen did not know whether the gusset plates that were removed from KSS's scope of work were the materials from PO-1 that were listed on the final packing slip and delivered to the Project site on July 8 [Doc. 76, pp. 205–07].

152.    She testified that she knew the mistake happened and that material related to PO-1 was delivered in July [*Id.* at 205–07, 223–24].

153.    She acknowledged that if the gusset plates were the only item delivered under PO-1 on July 8, "the overall analysis" would be "affect[ed]" and the difference for purposes of liquidated damages would be 25 days [*Id.* at 205, 207, 223].

154.    Despite never having fabricated gusset plates, Ms. Pettersen believed that Rosenblad's mistake should not have been a delay event for KSS because gusset plates take a few days to fabricate in the mix of other things [Doc. 77, pp. 91–92; Doc. 78, p. 83].

155.    However, it does not appear Ms. Pettersen considered the fact that KSS had trouble sourcing the material—stainless steel—at the time, and accordingly, did not factor that into her delay analysis.

156.    In light of the above, the Court respectfully does not find Ms. Pettersen's report or testimony at trial as to the quantification and apportionment of delay to be particularly persuasive.

27

157.   Meanwhile, KSS did not attempt to quantify how many days it was delayed because of RFI 1, RFI 2, RFI 3, the mistake of removing the gusset plates from its scope of work, or Rosenblad's return of approvals on April 14 and 15 [Doc. 78, pp. 189–90; Doc. 77, p. 159; *see also* Doc. 79, p. 4].[9]

158.   KSS's expert did not quantify any delays in the Project and generally opined about potential causes of delay in the Project [Doc. 77, pp. 159–61, 181–82].

159.   However, KSS's expert's testimony was substantially discounted, as many of the milestone dates in PO-1 that he included in his report were wrong [*See, e.g.*, *id.* at 155–56.  Indeed, he testified that his copy of PO-1 had an "ink blot on it, and so the date was actually slightly obscured" [*Id.*].

160.   Underscoring this finding is the fact that KSS barely cites to its own expert's testimony or report in its post-trial materials.

161.   Mr. Weaver testified that he did not "need to hire an analyst to tell [him] down to the minute how long the delay was," as he attributed "weeks" of delay to Rosenblad [Doc. 78, pp. 189–90].

162.   He cited to the month when KSS waited for approved design drawings from Rosenblad, which, in his opinion, resulted in a month's delay "across the board" [*Id.* at 73].

---

[9]  KSS attempted to quantify the delay for the first time in its post-trial brief [*see* Doc. 79, pp. 8–9].

163.    Mr. Weaver testified that the changes and omissions in the design drawings "slow[ed] down the job extremely," which gave KSS pause before it purchased material until it received approvals from Rosenblad [*Id.* at 74].

164.    While Mr. Weaver agreed that not all RFIs interfere with the critical path of the Project, he testified that the three RFIs in this case did, as they were not asking for minor clarification points about dimensions [*Id.* at 224].

165.    The Court credits Mr. Weaver's testimony on this issue given his direct involvement with and oversight of KSS's fabrication process on the Project [*see id.* at 187].

**E.      Defective Work – June and July 2020**

166.    Yates, through its project engineer Ms. Dishner, performed quality control checks of the steel that KSS delivered to the Project site [Doc. 74, pp. 10, 83–84; Doc. 75, pp. 130, 132–33].

167.    Yates is a sophisticated construction company, taking in approximately $2.5 to $3 billion dollars each year, according to Ms. Dishner [Doc. 75, p. 130; Doc. 78, p. 242].

168.    Throughout mid-June, Rosenblad informed KSS of several issues with the quality of steel that was delivered to the Project site and observed by Yates [Pl. Ex. 26; Pl. Ex. 27; Pl. Ex. 30; Doc. 74, pp. 89–90].

169.    On June 15, Rosenblad informed KSS that Yates was not accepting a portion of one of its deliveries, and asked KSS how it planned to correct the issues and when the parts would be back on site [Pl. Ex. 26]. The issues that Yates observed

29

included welds that were not ground correctly, parts not cleaned before cold "galv" spray, and welds with cracks [*Id.*]. Rosenblad also forwarded KSS photographs that were taken and sent to Rosenblad by Ms. Dishner, who stated that the grating and handrails were "poor craftmanship" and "unacceptable" [*Id.*].

170. Mr. Weaver immediately met with Ms. Dishner at the Project site to observe the issues [Pl. Ex. 28], and KSS repaired the defective items and returned them to the Project site the next day [Doc. 78, pp. 108–09].

171. Additionally, on June 15, Rosenblad informed KSS that it was discovered that the bolts for the stair treads and certain washers and nuts were the wrong sizes [Pl. Ex. 27].

172. On June 17, Ms. Dishner informed Rosenblad of more issues with the steel, such as pipe shoes did not have the re-pads welded on and the stair stringer bolt holes were drilled incorrectly [Pl. Ex. 30].

173. On June 17 and 18, Rosenblad forwarded Ms. Dishner's email and corresponding pictures of the issues to KSS [*Id*; Pl. Ex. 66].

174. On June 18, Rosenblad notified KSS of additional issues that Yates observed with grating that was repaired by KSS and sent back to the Project site, noting that it was "not a good look for the both of us" [Pl. Ex. 29].

175. Upon receiving notice of the above-cited concerns, KSS responded and repaired the steel [Doc. 78, pp. 104–05, 108–09].

176.     Indeed, Rosenblad admits that KSS was responsive to the issues raised by Yates and Rosenblad in June and took care of the issues that were brought to its attention in June [Doc. 74, pp. 89–90; Doc. 76, pp. 50–52, 57].

177.     Mr. Thelander testified that he had no reason to believe that KSS did not take care of the issues that were raised in Ms. Dishner's June emails [Doc. 76, p. 52].

178.     In light of the above, the Court finds that the evidence preponderates in favor of a finding that KSS, after receiving notice of the above-cited defects in the steel, responded and repaired the defects.

179.     The majority of the steel delivered to the Project site by KSS had no issues, with only the "supplemental" items—namely the grating and platforms—having issues [*Id.* at 51; Doc. 75, p. 191].

180.     Nonetheless, Rosenblad presents invoices in the total amount of $1,926.61 for purchases it made in June 2020, which it attributes to KSS's defective work.

181.     Under a purchase order dated June 28, Rosenblad purchased two flat bars in the amount of $13.17 from Londerville [Pl. Ex. 31]. Mr. Thelander could not recall where those pieces fit into the Project, but claimed they were supposed to be fabricated by KSS [Doc. 74, pp. 90–91; Doc. 76, pp. 52–53]. He acknowledged there was no documentation besides the purchase order reflecting that KSS was to blame, either for failing to produce the pieces or for producing them but not in conformity with the approved drawings [Doc. 76, p. 54]. However, he stated that Rosenblad would not have bought the parts for the sake of buying them if they were supposed to be supplied by KSS

31

[*Id.* at 53–54]. He also did not know whether he notified KSS before paying the invoice [*Id.* at 54].

182. The evidence does not preponderate in favor of a finding that KSS was aware of any such defects in its steel that caused Rosenblad to purchase the two flat bars, or that KSS was asked to repair any such issues.

183. Under a second purchase order dated June 29, Rosenblad purchased a pipe to be fabricated under PO-2 in the amount of $1,359.20 [*Id.* at 54–55; Pl. Ex. 32; Doc. 74, p. 91]. Mr. Thelander recalled that the pipe was delivered to the Project site, but it was rejected and could not be used because the quality was so bad [Doc. 76, p. 56]. As a result, he recalled that Rosenblad had to fabricate it itself [*Id.*]. Mr. Thelander could not recall whether there was any documentation showing that Rosenblad notified KSS of the issue [*Id.* at 57–58]. He also did not state whether KSS was aware of the issue.

184. Under a third purchase order dated June 30, Rosenblad purchased certain parts that were to be fabricated under PO-1 in the amount of $554.24 from Absolute Supply, LLC [*Id.* at 58–59; Pl. Ex. 33]. Mr. Thelander believed the pieces related to the parts that were mistakenly removed from KSS's scope of work [Doc. 76, p. 59]. Rosenblad presented no evidence demonstrating that KSS was made aware of Rosenblad's purchase in advance, or that Rosenblad raised the matter with KSS and gave KSS the opportunity to respond [*Id.* at 60].

185. Mr. Thelander believes that KSS was informed of the items that Rosenblad purchased in June by Mr. Mackie, and based on those communications, he approved payment for the purchase orders [*Id.* at 138–39]. However, on cross-examination, he

32

acknowledged that he did not communicate with KSS about the invoices, and he did not know if Mr. Mackie did either [*Id.* at 170].

186. Additionally, pursuant to invoices dated July 31, Rosenblad purchased stainless steel nuts and washers for pipe supports from McMaster-Carr in the amount of $74.96 and $59.64 [Pl Ex. 36; Pl. Ex. 37].[10] Mr. Thelander testified that the items were not delivered to the Project site [Doc. 74, p. 96]. On cross-examination, Mr. Thelander conceded that there was no evidence demonstrating that KSS received notice that these parts were not produced or did not conform [Doc. 76, pp. 69–70].

187. Mr. Weaver did not recall receiving notice from Rosenblad before Rosenblad made the above purchases, and he testified that he was unaware of any documentation that would connect the purchase orders to specific defects in the steel that KSS provided [Doc. 78, pp. 172–73].

188. All material delivered to the Project site by KSS was ultimately accepted by Yates [Doc. 63 ¶ 29].

### F. Stripper Condenser Platforms

189. The stripper condenser platforms represented approximately 5% of KSS's total scope of work on the Project [Doc. 78, p. 122].

---

[10] As noted *supra*, on June 15, Rosenblad told KSS that certain washers and nuts delivered to the Project site were sized incorrectly [Pl. Ex. 27]. However, based on Mr. Thelander's testimony, the evidence does not preponderate in favor of a finding that the nuts and washers Rosenblad ordered were the same washers and nuts that Rosenblad told KSS were the wrong size. Indeed, Mr. Thelander testified that Rosenblad ordered the stainless-steel nuts and washers because they were never delivered to the Project site, not because they were delivered but nonconforming [Doc. 74, p. 96].

33

190.  Yates assembled the stripper condenser platform on the ground, which, according to Mr. Dishner, is standard industry practice [*Id.* at 110; Doc. 75, pp. 155–56; 196–97, 216–17].

191.  Yates generally assembles structures like these platforms on the ground to reduce costs and mitigate safety risks, as there is no working platform in the air [Doc. 75, p. 219].

192.  Once assembled on the ground, Yates lifted the upper platform into the air and attempted to install it to the stripper condenser [*Id.* at 155–56; Doc. 78, p. 110].

193.  In doing so, Yates discovered that the platform would not fit around or bolt up to the stripper condensers, which led to multiple lift efforts [Doc. 75, pp. 155–56; Doc. 78, p. 110].

194.  Ms. Dishner recalled that the platforms would not fit to the stripper condenser and required some modifications and rework [Doc. 75, pp. 166, 217, 220–22, 228, 236].

195.  While she testified that she was generally involved when Yates had issues fitting the platforms, she testified that she did not know (and could not recall) why they would not fit, as she was primarily involved with the issues for which she took pictures [*Id.*].  Given her lack of recollection as to the specific cause of the issues with the platforms, the Court does not find Ms. Dishner's testimony on the matter to be particularly persuasive.

196.  Contrary to Ms. Dishner's testimony that it is standard industry practice to assemble platforms on the ground, Mr. Weaver testified that, in his 68 years of steel

34

erection experience, galvanized steel draws and pulls should be installed one piece at a time in the air [Doc. 78, p. 139].

197. By assembling the platform on the ground and completely tightening the bolts, Mr. Weaver explained that it could not have been flexed or moved in the air to fit [*Id.* at 145–46, 234]. Instead, if the pieces were attached to the platform one piece at a time in the air and hot bolted, he believed that Yates would have been able to manipulate the platform into place [*Id.* at 144, 146–47].

198. Further, he testified that, "in this day and time," with scissor and man lifts readily available, he believed it is safer to put each piece up one at a time [*Id.* at 143–45, 242–43].

199. Upon consideration of the conflicting testimony of both Mr. Weaver and Ms. Dishner, the Court finds Ms. Dishner's testimony to be more persuasive regarding the method of assembly of the stripper condenser platforms.

200. Ms. Dishner's testimony reveals that Yates, a sophisticated construction company, has routine experience assembling structures like the platforms, and did so on the ground in conformity with standard industry practice.

201. While Mr. Weaver testified that he had recent steel erection experience, it does not appear that he has recent experience erecting a similarly sized structure on a comparable project [*Id.* at 232–43]. Moreover, Mr. Weaver did not dispute what Ms. Dishner posited as being standard industry practice—his testimony merely reveals that he disagreed with her assessment of the situation.

35

202.    On August 7, Adam Antkiewicz, a mechanical engineer for Rosenblad [Doc. 74, p. 43], gave installation suggestions to Yates in an attempt to get the platforms to fit, including requesting that Yates remove the inner members of the lower platform and install only the outer "radial" members [Def. Ex. 51; Doc. 75, p. 83].  After doing so, he requested that Yates check to see if the interior members could be installed [Def. Ex. 51].  If the parts could not be installed in the "existing bolting locations," he opined that it "may be best to field weld [sic] their clips in the modified locations, but we will need to know how far off they are from their intended locations in order to verify them against the design calculations" [*Id.*].

203.    After taking measurements of the platforms on August 8, Mr. Antkiewicz told Yates that he looked at the geometry of certain members of the lower platform using his as-built measurements (as compared to the shop drawings) and was "confident that [the platform] can be installed and approximately maintain the overall dimensions [sic], thus requiring no modification to the grating and hand rails" [*Id.*; Doc. 75, p. 88].  Mr. Antkiewicz's statement refers only to the lower platform and does not demonstrate that the individual members were fabricated in strict accordance with the approved shop drawings.

204.    Mr. Antkiewicz also measured the upper frame and his "initial look [was] very close to maintaining the approximate overall dimensions" when he compared his measurements to the approved shop drawings [Def. Ex. 51; Pl. Ex. 67; Doc. 75, p. 84].

205.    However, he noted that he observed two gaps between two members and the vessel on the upper platform [Def. Ex. 51; Pl. Ex. 67]

36

206. On August 10, a representative from Yates asked Mr. Thelander how he wanted to "handle the extra work associated with all this," referring to the email chain from Mr. Antkiewicz [Def. Ex. 51; Doc. 75, pp. 89–90, 93].

207. Yates did not provide a breakdown of any estimated costs associated with the extra work, provide any explanation or detail about what extra work was required, or state why it believed the platforms would not fit [*Id.*].

208. Rosenblad first informed KSS that "there are some issues with the steel supplied to site for the stripper condenser platforms" on August 10 [Pl. Ex. 67; Doc. 78, p. 119].

209. In addition, Rosenblad provided KSS a two-page document listing specific steel parts on the stripper condenser platform and denoting which were fabricated correctly or incorrectly, including certain dimensions that Rosenblad stated were too long or short [Pl. Ex. 68, Doc. 76, pp. 117–18].

210. The document was created based on measurements taken by Rosenblad's engineer in which he compared the as-built measurements to the approved shop drawings [*Id.*].

211. On August 11, Mr. Mackie forwarded Yates's email to Mr. Weaver about the "extra work" associated with Yates's attempts to install the platforms and asked how KSS wanted to handle the "extra costs associated with the parts on the stripper condenser platforms" [Def. Ex. 51; Doc. 75, pp. 89–90].

212. On August 12, Mr. Mackie asked Mr. Weaver to go to the site the next morning to "look at the issues with the stripper condenser platforms" and assess the work

37

that was needed to fix the issues with the platforms—whether that meant bringing people and equipment to the site to correct the platforms or if the materials needed to be brought back to KSS's fabrication shop [Def. Ex. 51; Doc. 76, p. 92].

213. After August 12, Rosenblad did not provide KSS an estimate about either the scope of work that Rosenblad believed was required or the amount of money it expected to spend to rectify the issues with the stripper condenser platforms, presumably because it expected KSS to rectify such issues [Doc. 75, p. 85].

214. On August 13, KSS sent Travis Weaver, Mr. Weaver's son who worked for KSS, to the Project site to take measurements [Doc. 78, p. 121; Doc. 76, pp. 121–22].

215. On August 14, KSS confirmed to Rosenblad that Travis Weaver went to the Project site and claimed that he "verified all dimensions per the approved fabricated drawings" dated April 22 [Pl. Ex. 75].

216. In support of the assertion that all dimensions were verified, KSS sent Rosenblad a list of 13 field measurements taken by Travis Weaver, as compared to the approved drawings, and asserted that "[a]ll fabricated materials meet approved drawings and were verified by Travis Weaver and witnessed by [sic] Yates personnel" [*Id.*; Pl. Ex. 71; Pl. Ex. 77].

217. Despite Mr. Lester's claim that Travis Weaver measured all dimensions, the 13 measurements that KSS sent to Rosenblad on August 14 related to members on the

lower platform only [Pl. Ex. 71; *see* Pl. Ex. 68].[11]  Mr. Lester also observed that "[t]he platform was assembled by Yates," indicating that he was referring only to one platform (i.e., the lower platform).  Thus, a fair reading of the email suggests that Travis Weaver verified "all dimensions" on the lower platform, which were the 13 expressly listed in Mr. Lester's email.

218.  This supports the Court's finding that Travis Weaver only took measurements of members on the lower platform.

219.  Thereafter, per Mr. Thelander's instruction, Rosenblad's engineer independently took additional measurements of the platforms and created a document comparing the approved drawings to his field measurements [Pl. Ex. 72; Pl. Ex. 77; Pl. Ex. 73; Doc. 76, pp. 117–18, 123].

220.  Rosenblad's engineer took additional measurements beyond KSS's 13, and by the Court's count, appears to have measured approximately 40 members on both the upper and lower platforms [Pl. Ex. 72].

221.  In doing so, Rosenblad's engineer concluded that 27 field measurement dimensions were not in accordance with the approved shop drawings [*Id.*].  Specifically, Rosenblad's engineer determined that 11 members on the lower platform and 10

---

[11]  In support of this finding, the Court reviewed the 13 parts that were measured by Travis Weaver against the measurement documentation that Rosenblad sent to KSS, which specified which members were part of the upper platform versus lower platform.

members on the upper platform were nonconforming—including bolts, locations of bolt holes, and channel lengths being either too short or too long [*Id.*].[12]

222. The document also noted problems with certain members and highlighted the differences between the field measurements taken by Travis Weaver and Rosenblad [*Id.*].

223. Of the 13 field measurements taken by Travis Weaver, Rosenblad's engineer observed that 11 were incorrect, and claimed that the members were nonconforming [Pl. Ex. 73; Doc. 78, pp. 127–28].

224. Rosenblad's position on the measurements was consistent, having measured the dimensions and communicated the discrepancies to KSS twice—on August 10 and again on August 18.

225. Rosenblad's measurements were more comprehensive and complete than KSS's, as Rosenblad's engineer measured both platforms, more members on each platform, and accounted for more dimensions.

226. In light of the above, the Court finds no reason to doubt or question Rosenblad's measurements or findings that there were discrepancies between the dimensions it measured and what the approved shop drawings required.

227. On August 18, Mr. Thelander sent Rosenblad's measurements to KSS, as well as KSS's measurements as marked up by Rosenblad's engineer and marked-up drawings that indicated the dimensions that Rosenblad believed were wrong [Pl. Ex. 71; Pl. Ex. 73; Pl. Ex. 76; Pl. Ex. 77; Pl. Ex. 78; Doc. 76, pp. 118–19, 123–25, 129–31].

_____

[12] These totals are based on the Court's review of the documents.

228. In Rosenblad's communication to KSS, Mr. Thelander stated that the dimensions of certain steel members were nonconforming and fabricated incorrectly, and stated:

> I don't know how you could reasonably have come to the conclusion that [KSS's] material was correctly supplied and met the project requirements. . . . In addition, it is clear from the pictures attached that the individual members are not manufactured according to the specifications by the detailer. . . . All costs for rectifying the structure will be back-charged to [KSS], as the re-work is necessary due to [KSS's] failure to properly manufacture the structure. At this point, it is impossible to quantify the amount as we will have to get an agreement from Yates on how the modifications will be made, and may possibly incur external engineering costs as well.

[*Id.*].

229. In response, on August 18, Mr. Lester suggested that Rosenblad's engineering was to blame for the platforms not fitting, and maintained, "The radius of the platform and overall dimensions matches Rosenblad's [sic] approved drawings and all the components associated with the assembly fit the scope." [Doc. 76, p. 125; Pl. Ex. 74 (emphasis in original)].

230. KSS introduced no credible evidence to support Mr. Lester's contention that Rosenblad's engineering was to blame.

231. Mr. Lester further told Mr. Thelander to "stop going back and forth over dimensional tolerances that do not solve the problem" [*Id.*].

232. On August 18, Mr. Thelander replied, in pertinent part:

> [Y]our statement that the problem was caused by engineering miscalculations by RDG is not supported by the facts. Our engineering in this regard has been verified not only by us but also by the third-party manufacturer of the unit and Yates.

41

> The essential problem with this portion of the structure are the discrepancies in dimensions of the delivered individual parts and members along with the stacked tolerances that is creating the problems for the installer in the field. . . .
>
> This is not a ["]back and forth" regarding the dimensional tolerances, as nobody in this business would have tolerances of 1" 3/8, for example. . .
>
> We will hold [KSS] responsible for ALL the costs for rectifying this with the installer and it is in everybody's best interest for you to assist in making the structure to be installed as quickly and efficiently as possible.
>
> In addition, we take issue with your issuance of a Notice of Non-Payment in light of the substantial backcharges that are owed from [KSS] to [Rosenblad] due to [KSS's] late delivery, the direct payments we made to your suppliers, among other issues.

[Pl. Ex. 74; Doc. 76, p. 127].

233.    On redirect examination, Mr. Thelander pointed out that KSS originally maintained that the pieces were manufactured according to the dimensions in the approved shop drawings, but shifted its position, noting "dimensional tolerances" [Doc. 76, pp. 127–28].

29.    The Court further credits Mr. Thelander's testimony about how, much like assembling IKEA furniture, if certain holes are missing or if parts are too long, the pieces will not fit together, which is what happened in this case [*Id.*].

234.    Notwithstanding this email exchange, Mr. Weaver testified that he was unaware of evidence that the steel members for the platform were not made in accordance with the approved shop drawings [Doc 78, p. 158].

235. Mr. Weaver testified that, at the time, he assumed that Travis Weaver's measurements were correct and that "somebody didn't know how to read a tape" [*Id.* at 128].

236. Rosenblad never asked KSS to make changes or modifications or new pieces based on Rosenblad's measurements, and Mr. Weaver testified that KSS would have made such modifications if so asked [*Id.* at 141, 168].

237. On August 20, Yates indicated to Rosenblad that it was going to incur costs to repair the platforms "to get them to fit properly" [Pl. Ex. 79; Doc. 76, pp. 132–34]. Yates's email to Rosenblad was intended to serve as "a notice that these repair costs will be billed to [Rosenblad] on a [time and materials] T&M basis" [Pl. Ex. 79; Doc. 75, p. 242].

238. The same day, Mr. Thelander forwarded Yates's email to Mr. Weaver, asserting that Rosenblad would in turn "hold [KSS] responsible for ALL the costs for rectifying this with the installer and it is in everybody's best interest for you to assist in making the structure to be installed as quickly and efficiently as possible" [*Id.*].

239. On August 21, Mr. Weaver and Mr. Lester went to the Project site to meet with Yates at Rosenblad's request [Pl. Ex. 40; Doc. 76, pp. 72, 109].

240. Rosenblad did not have personnel onsite for KSS's visit [Doc. 78, pp. 151, 158; Doc. 76, p. 73; Doc. 75, p. 97].

241. While onsite, Yates did not ask Mr. Weaver to look at the grating [Doc. 78, pp. 151, 158; Doc. 76, p. 73].

43

242.    Yates also did not discuss the dimensions of the steel parts with Mr. Weaver or indicate that the members were not manufactured in accordance with the approved shop drawings [Doc. 78, p. 151].

243.    While at the Project site, Mr. Weaver told Yates representatives his opinion that the platform would not fit was because it was assembled on the ground and the bolts had been completely tightened such that the platform could not be maneuvered in the air [*Id.* at 146, 149, 151, 146–47].  Nevertheless, Yates representatives maintained that they wanted to assemble the platform on the ground [*Id.*].

244.    As a result, as requested by Yates, KSS provided a channel piece so that Yates could attach the upper platform to the stripper condenser in one piece in the air, as there was a gap between the stripper condenser and the platform [*Id.* at 150–52, 146–47, 211; Def. Ex. 55-M].

245.    Following KSS's site visit, Mr. Lester provided a recap of KSS's site visit to Rosenblad on August 25:

> We brought a ring that was rolled the same diameter as the vessel (stripper condenser) and put it in place on the ground next to the platform.
> [Due] to the galvanizing process (heat and adding galvanizing material)and tolerances the platform should have been assembled in place in the air around the vessel. This was not the case.
> The platform was assembled on the ground and tried to install fully assembled [due] to the area of the location on site. The platform WILL fit in place as manufactured per approved drawings.
> Everyone present agreed. The site wanted us to furnish a piece of channel. Again d[ue] to the assembly on the ground, [there] was a need to add[ ] a piece of channel to take up tolerance and galvanizing. [KSS] supplied the piece of channel 08/22/2020.
> Yates was to install platform on Monday [August 24] as per all present.

[Pl. Ex. 40; Doc. 78, pp. 147–48].

44

246.     Upon review of the email at trial, Ms. Dishner testified that she did not understand the statement of "due to galvanizing the heat and adding galvanizing material" because, while galvanizing does do that, putting it in the air, if it was out of tolerance on the ground, would not make a difference in terms of getting the platforms to fit [Doc. 75, p. 169].

247.     She also explained that the steel would not "move dimensions" or grow two inches even if Yates assembled the platform in the air, and it would not have made a difference if the steel were erected on the ground or in the air [*Id.* at 219].  According to Ms. Dishner, the platforms would not have fit even if they had been assembled on the ground given the way they were originally fabricated [*Id.* at 169–70, 219].

248.     The Court finds Ms. Dishner's testimony that the hard steel would not "move dimensions" or grow inches in the air to be more plausible than Mr. Weaver's suggestion that the steel draws and pulls in the air, thereby enabling the platforms to fit under these circumstances and as applied to this case.  Indeed, it is undisputed that KSS ended up furnishing a channel piece to bridge a gap between the stripper condenser platform and the stripper condenser.  Assuming Mr. Weaver's explanation as correct, the Court questions how assembling the platform in the air piece by piece would allow the steel to grow and fill the space that the channel ultimately filled.  In other words, if there was a gap between the stripper condenser and the platform, why would the steel members require manipulation to fit?

249.     Aside from assembling the platform on the ground, there is no evidence that Yates assembled the platform incorrectly.

45

250.    As a result, the Court finds that the evidence preponderates in favor of a finding that the problems with stripper condenser platforms were not caused by Yates's method of assembly or the negligence of a third party.

251.    KSS did not hear anything further from Rosenblad or Yates after Monday, August 24 to suggest that the platforms were not installed or that there were additional problems with the platforms that required KSS's attention beyond KSS's furnishing the channel piece on August 21 [Doc. 78, pp. 152–53].

252.    After KSS's site visit on August 21, Mr. Weaver believed that KSS had resolved the issues that Rosenblad brought to KSS's attention and that there were no remaining issues with the steel [*Id.* at 162].

253.    Mr. Thelander also acknowledged that there is no evidence indicating that the platforms were not installed on August 24 as Mr. Lester's August 25 email indicates [Doc. 76, p. 159].

254.    On August 25, Rosenblad forwarded Mr. Lester's email to Yates's representatives, asking for confirmation if KSS's summary of what transpired matched Yate's recollection [Pl. Ex. 40; Doc. 74, pp. 100–01].

255.    A Yates representative responded on August 26, stating,

The conversation [sic] was quite different. [KSS] furnished a ring that they manufactured which is the same O.D. as the stripper condenser tank. It was determined that the platform WILL NOT fit without modification. [KSS] also provided a 4' piece of 10" channel to make the necessary modifications that WE ALL agreed needed to be made.

[Pl. Ex. 40; Doc. 75, pp. 96–107].

Case 3:20-cv-00511-TAV-JEM   Document 84   Filed 03/28/24   Page 46 of 110   PageID #: 3297

256.    Rosenblad forwarded the communication to KSS the same day [Pl. Ex. 39].

In response, on August 27, Mr. Lester advised Rosenblad to "contact [KSS's attorney]

with any more of your rubbish" and instructed, "Going forward do not contact KSS, Inc."

[Pl. Ex. 39; Doc. 74, p. 103].[13]

257.    After KSS's communication on August 27, the relationship between KSS

and Rosenblad broke down, and KSS did not return to the Project site [Doc. 76, p. 128].

### G.    Handrails and Grating Defects in August

258.    On August 20, Ms. Dishner informed Rosenblad that certain handrails

would not bolt up to the steel and three pieces of grating on the upper stripper condenser

platform were fabricated incorrectly and sent photographs of the issues she noted [Pl. Ex.

38; Doc. 74, pp. 97–98; Doc. 75, pp. 157–60; Doc. 78, p. 115].  She asked Mr. Thelander

how he wanted Yates to proceed and whether Yates should fix the issue or if Rosenblad

would send someone to the Project site [*Id.*].

259.    Although Mr. Thelander believed Rosenblad discussed the handrails and

grating issues with KSS, there is no credible evidence in the record to corroborate his

belief [Doc. 74, p. 97–98; Doc. 76, pp. 72–73, 110, 144–45].

260.    On cross-examination, Mr. Thelander testified that he could not recall

whether KSS was informed of the issues with the handrails and grating, but he believed

KSS was onsite at the time and there were discussions involving the issues, even though

he was not present [Doc. 75, pp. 70–71, 78–79].

---

[13]    Mr. Lester also accused Mr. Thelander of drafting Yates's statement [Doc. 74, pp. 103–04].

47

261. Moreover, Mr. Thelander acknowledged that he had no reason to believe that KSS would not review the issue and respond if given the chance at that time [*Id.* at 71].

262. There is no credible evidence that Ms. Dishner's August 20 email was forwarded to KSS upon receipt, consistent with Rosenblad's past practice.

263. Mr. Dishner testified that Yates showed KSS all the issues with the steel on-site that were depicted in the photographs she sent to Rosenblad, but she could not "say for certain" [*Id.* at 164].

264. While Ms. Dishner generally recalled KSS personnel coming to the Project site and showing them the platforms and parts of the platforms that had been fabricated incorrectly (i.e., the platform grating), the issues to which she referred relate to what she photographed in June, not August [*Id.* at 164, 242].

265. Moreover, there is no evidence that Ms. Dishner personally met with KSS representatives during their site visit on August 21 to show them the issues she photographed and sent to Rosenblad on August 20. The evidence reveals that she was not involved with KSS's August 21 site visit in which it provided the channel piece for the platforms.

266. Mr. Weaver agreed that everyone knew there were concerns with the stripper condenser platforms and grating [Doc. 78, p. 222]. As to the grating issues, however, he clarified that he was aware only of the grating issues regarding weld splatter, which KSS took back to its shop and cleaned up in June [*Id.* at 195–96].

48

267. He further testified that he was not made aware of issues with the grating as depicted in Ms. Dishner's August 20 photographs [*Id.* at 111, 114–15, 157–58; Doc. 75, p. 232].

268. Had he been aware, he claimed that KSS could have fixed the three pieces of defective grating within a day [Doc. 78, pp. 114–15].

269. There is no evidence showing that Yates asked KSS to look at the grating while KSS representatives were on-site on August 21 to observe the issues with the stripper condenser platforms, [*Id.* at 151, 158; Doc. 76, p. 73; Doc. 75, p. 232].

270. Mr. Weaver testified that, when he was on site, he was asked to look only at the stripper condenser platforms on the ground, and he was not informed of the grating issues as noted by Ms. Dishner on August 20 before or during his site visit [Doc. 78, pp. 195–96]. The grating had already been installed and was not on the ground with the platforms.

271. In light of the above, Rosenblad has not provided credible proof that KSS was aware of the grating issues that Ms. Dishner observed, photographed, and sent to Rosenblad on August 20.

272. Yet, pursuant to an invoice dated August 28, Rosenblad purchased grating from McNichols Co. in the amount of $5,151.66 [Pl. Ex. 41; Doc. 74, pp. 105–06]. Rosenblad purchased the grating to replace the grating provided by KSS under PO-1 [Doc. 74, pp. 105–06; Doc. 76, p. 110].

49

273. At that point, Mr. Thelander testified that Yates and Rosenblad were attempting to remedy the defects, but KSS was no longer involved because the parties' relationship soured [*Id.*].

### H.    Payment History under PO-1 and PO-2

274. The cumulative value of PO-1 and PO-2 was $174,389.37 [Doc. 63 ¶ 35].

275. Rosenblad made direct payments in the amount of $114,900.69 to KSS and, at KSS's request, also made payments directly to 3D in the amount of $5,200.00 and to KSS's galvanizer in the amount of $8,867.00 [*Id.* ¶ 36; Pl. Ex. 25; Pl. Ex. 23].[14]

276. Additionally, as noted *supra*, the evidence shows that Rosenblad paid a total of $7,212.83 to various suppliers from late June through August.[15]

277. PO-2's payment terms called for Rosenblad to issue payment in the amount of $15,000 to KSS on May 8, with the balance due "Net 15" from delivery [Def. Ex. 3].

278. On May 9, Rosenblad issued a check to KSS for its work on the Project in the amount of $15,000 under PO-2, the total value of which was $31,110.00 [*Id.*; Doc. 74, pp. 73–76; Pl. Ex. 21].

279. On June 9, KSS sent an invoice to Rosenblad for $30,370.68 for the delivery of the steel package to the Project site under PO-1, accounting for payments to

---

[14]   Accounting for these adjustments, the Court's calculation reveals that KSS would be owed $45,421.68 [Doc. 74, pp. 108–09]

[15]   It appears Rosenblad miscalculated the amount as being $7,548 (which is also the amount set forth in Ms. Pettersen's report) [Doc. 82, p. 27; Pl. Ex. 80; Doc. 76, p. 188].  Based on the evidence Rosenblad presented at trial, the Court observes the amount is lower— $7,212.83.

3D and the galvanizer, even though, as the Court found *supra*, KSS had not yet delivered all items to the Project site at that time [Def. Ex. 5; Doc. 78, pp. 218–19].

280. Pursuant to an invoice dated July 7, KSS billed Rosenblad for an additional $16,110.00 for the remaining payment it was owed under PO-2 [Def. Ex. 7].

281. There is no evidence that Rosenblad received the $16,110.00 invoice prior to discovery in this case [Doc. 78, p. 218].

282. Nonetheless, KSS believes $16,110.00 is still owing to KSS from Rosenblad under PO-2 [Doc. 76, p. 43; Doc. 78, p. 175].

### I. The Amount KSS Claims Remains Outstanding under PO-1 and PO-2

283. Pursuant to the parties' stipulation, and based on the Court's calculation, the amount owing to KSS is $45,421.68, without contemplating backcharges or liquidated damages [Doc. 74, p. 108; *see also* Doc. 63 ¶¶ 35–36].[16]

284. However, it appears KSS believes it is owed $30,370.68 under PO-1 and $16,110 under PO-2, for a total of $46,480.68, which exceeds the amount to which the parties have stipulated [Doc. 78, pp. 174–75].

285. KSS has not explained or justified why the amount it claimed exceeds the stipulated amount.[17]

---

[16] The parties stipulated that the cumulative value of PO-1 and PO-2 was $174,389.37 [Doc. 63 ¶ 35]. Rosenblad made direct payments in the amount of $114,900.69 to KSS and, at KSS's request, also made payments directly to 3D in the amount of $5,200.00 and to KSS's galvanizer in the amount of $8,867.00 [*Id.* ¶ 36]. Subtracting those payments from the cumulative value, Rosenblad would owe $45,421.68 to KSS.

[17] It is unclear whether KSS was and is aware of such discrepancy.

286. The Court observes that KSS's invoice dated June 9 deducts only $7,808 for Rosenblad's payment to the galvanizer [Def. Ex. 5], while the parties have stipulated to the amount of $8,867.00 for that payment [Doc. ¶ 36; Pl. Ex. 25; Pl. Ex. 23].[18]

287. The evidence introduced at trial supports the parties' stipulation, not the amount claimed in KSS's June 9 invoice [*See* Pl. Exs. 22, 23, 25].

288. The difference between the amount claimed in the June 9 invoice and the stipulation is $1,059—which resolves the discrepancy between $45,421.68 and $46,480.68.

289. Accordingly, it is undisputed that Rosenblad has not paid $45,421.68 to KSS under PO-1 and PO-2.

**J.    Overtime Claimed by KSS**

290. Before April 20, Mr. Lester discussed with Mr. Mackie the possibility of KSS accruing overtime on the Project, but Mr. Weaver was not part of such discussions [Doc. 78, pp. 81–82].

291. Mr. Mackie lacked the authority to approve overtime costs on behalf of Rosenblad [Doc. 74, p. 32], and could only approve overtime costs with Mr. Thelander's authorization [*Id.* at 67].

292. After Rosenblad sent approvals on April 14 and 15, KSS worked over the weekend on April 18 and April 19, and Rosenblad was aware [Def. Ex. 35; Doc. 76, p. 39].

---

[18] It appears this may have been an oversight by KSS in creating the invoice and in litigation of this matter.

293. KSS claims to have worked $15,000 in overtime over the weekend on April 18 and April 19 to help get back on schedule [Doc. 78, pp. 81–82, 176, 216–17].

294. Pursuant to an invoice dated July 7, KSS charged Rosenblad for $15,000 regarding the overtime it claimed to have accrued to "complete [p]ipe supports per Matt Mackie on 4/20/2020 meeting with Curtis Blake overtime was [approved] to be paid at the end of the project of $15,000 see email Friday April 17, 2020" [Def. Ex. 6].

295. Mr. Weaver could not "say for sure" how KSS calculated $15,000 in overtime because Mr. Lester calculated the amount, but he stated the figure was likely a "guesstimate" of manhours [Doc. 78, p. 220].

296. The $15,000 reflects KSS's "guesstimate" of the hours worked, as opposed to the actual hours KSS worked. Indeed, there is no evidence that KSS kept a time clock or records of the actual hours worked, or that the $15,000 reflects the actual hours worked [*Id.*].

297. Mr. Weaver testified that $15,000 was lower than what KSS actually paid out in overtime [*Id.* at 176–77].

298. The parties did not execute a written agreement to pay $15,000 in overtime to KSS [*Id.* at 217; Doc. 74, p. 67].

299. The evidence preponderates in favor of a finding that Rosenblad never agreed or disagreed to KSS's overtime work.

300. Further, the evidence does not preponderate in favor of a finding that Rosenblad was aware that KSS would accrue overtime before April 22. The evidence indicates only that Rosenblad was aware KSS would work over the weekend, after which

53

point, the parties would discuss whether overtime was necessary going forward on the Project.

301. KSS presented no evidence that it provided Rosenblad an estimate of cost or manhours it expected to work over the weekend that would cause Rosenblad to believe KSS would accrue overtime that weekend.

302. Mr. Thelander, who was responsible for approving overtime payments for Rosenblad, testified that he never approved the overtime that KSS claimed to have worked [Doc. 74, p. 67; Doc. 78, p. 176; Doc. 76, pp. 39, 136–37].

303. Mr. Weaver's testimony about what transpired between the parties regarding overtime is not particularly persuasive, as it does not appear that he was directly part of any such discussions.

304. Additionally, although Mr. Weaver claimed the parties had a verbal agreement to pay overtime, he later acknowledged that Rosenblad neither agreed nor disagreed to KSS's overtime, only that it was aware that KSS was going to work over the weekend [Doc. 78, pp. 175–76, 216]. His latter testimony was corroborated by Mr. Thelander [*Id.* at 176; Doc. 74, p. 67; Doc. 76, pp. 39, 136–37].

305. Nonetheless, Rosenblad received the benefit of KSS's work [Doc. 76, p. 40].

306. Despite PO-1 requiring that "[a]ny claim for adjustment must be asserted in writing within 15 days from the date the change is ordered," KSS did not submit any written change order request amending the terms of PO-1 to add $15,000 in overtime [Doc. 78, pp. 217–18; Def. Ex. 2 ¶ 1; Doc. 74, p. 67].

54

307.    Rosenblad first received the $15,000 invoice during discovery in this case [Doc. 76, p. 136; Doc. 78, pp. 217–18].

308.    KSS has not been paid the requested $15,000 for overtime [Doc. 76, p. 43; Doc. 78, pp. 175–76].

## K.    Backcharges from Yates to Rosenblad

309.    On September 24, Yates sent Mr. Thelander its backcharge documentation and a proposed change order, which included several attachments that purport to demonstrate the costs that Yates claimed it incurred for rectifying issues relating to the steel [Pl. Ex. 47; Doc. 75. p. 241].

310.    Rosenblad would have received the $70,720.60 backcharged by Yates pursuant to Rosenblad's contract with Yates [Doc. 76, p. 116].

311.    The first attachment to the email consists of handwritten notes by a Yates representative that is dated 8/21/2020 and titled "Rosenblad Rework hours" [Pl. Ex. 47]. According to the notes, on July 31 and August 1, Yates claimed to have had six workers that accumulated manhours, a total 105 hours across both days, doing an "Initial Pick and hold" of the stripper condenser platform and "pull[ing] measurements and conclud[ing] it would not fit" [*Id.*; Doc. 75, pp. 226–29].

312.    On August 4, Yates claimed to have accumulated an additional 47 manhours taking "various filler steel members out, pull[ing] measurements to try to determine the issue. Pick and hold again to figure out if our plan would work" [Pl. Ex. 47].

313.    On August 12, according to the notes, Yates also accumulated an additional 55 manhours determining which pieces of channel were going to "need rework" to make the upper platform fit [*Id.*].  The notes further indicate that, on August 12, both Yates and Rosenblad were still trying to "decipher what issues were causing the platform not to fit" [*Id.*].

314.    Yates also accrued hours on August 21, 22, 24, and 25, but the notes contain no description of the work performed by Yates [*Id.*].

315.    Yates also accrued hours from August 26 through August 27, which were approved by Mr. Antkiewicz on or around August 28, but the notes do not indicate what kind of work Yates performed [Pl. Ex. 47; Doc. 75, p. 231].

316.    Additionally, the handwritten notes indicate that, on September 16, Rosenblad signed off on 343 hours that Yates worked from August 29 and 31, and September 1 through 6 and September 8 [*Id.*].  The notes do not include any description of the work that Yates performed [*Id.*; Doc. 75, p. 231].

317.    All of the hours Yates worked after August 12 contain no description of the work that Yates performed [Pl. Ex. 47].

318.    In total, by the Court's calculation, it appears Yates accrued costs in the amount of $14,260.00 in equipment from August 21 through September 8 [*Id.*].

319.    Upon providing the channel piece to Yates on August 21, KSS had no reason to believe that additional work would be necessary on the platforms after August 24, the date on which Yates indicated it would lift and fit the upper platform with the channel piece fabricated by KSS.

56

320.     Mr. Thelander opined that the hours Yates worked in September show that its original effort to fit the platform after KSS supplied the channel piece was unsuccessful and underscored KSS's faulty fabrication [Doc. 76, pp. 113–14]. If it had been successful, and if KSS's solution had worked, he believed that Yates would not have accumulated the backcharge hours and costs [*Id.*].

321.     The limited descriptions in the notes regarding the work that Yates performed relate only to the stripper condenser platforms and not the issues with the grating, even though Yates's unsigned proposed change order contemplates the rework of both the platforms and the grating [*Id.*; Doc. 76, p. 94; Doc. 75, p. 232].

322.     Also attached to Yates's email to Rosenblad was a proposed change order dated July 23, 2020, with an approximate cost estimate of $70,720.60 for "Structural Steel and Platform rework" [Pl. Ex. 47, p. 13].

323.     Yates's project manager created the document [Doc. 75, p. 167].

324.     The change order is unsigned, and states that it was occasioned because "steel platforms and grating would not fit" [*Id.*; Pl. Ex. 47].

325.     As for the written description, the unsigned change order provides:

The [platforms], and grating Rosenblad supplied [sic] would not fit and was fabricated wrong. Rosenblad was notified and multiple trips by [Rosenblad] and the Steel Supplier caused major rework to the platforms and grating. The issue is the platforms and grating is 60' in the air requiring [multiple] pieces of equipment and extended manpower.

[*Id.*].

326.    Despite the change order being dated July 23, 2020, Mr. Thelander testified that it was sent in September because it was attached to the September 24 email chain from Yates [Doc. 76, pp. 90, 96].

327.    The $70,720.60 does not relate to problems that were found on previous deliveries from June and relates only to the stripper condenser platform and grating issues observed in August [*Id.* at 94–95, 111–12; Doc. 75, pp. 229, 235–36].

328.    Ms. Dishner testified that Yates's change orders normally include specific drawings, emails, or photographs, but observed that this particular change order did not, but she noted that various emails were exchanged between Yates and Rosenblad in which the parties discussed the issues with the steel [Doc. 75, pp. 225–26, 230].

329.    While Ms. Dishner testified there is typically a potential change notice in which a cost estimate is provided before Yates embarks on a particular rework, Rosenblad did not introduce any such evidence in this case of a cost estimate [Doc. 75, p. 227; *but see* Doc. 76, p. 96].

330.    Mr. Thelander did not recall that Yates sent Rosenblad any such information before embarking on the rework [Doc. 76, p. 96].

331.    According to KSS's expert, by designating a general area of the work rework (i.e., the stripper condenser platform), Yates's backcharge document was sufficient to attribute the rework to KSS's work [Doc. 77, p. 147].

332.    Rosenblad approved all the work that Yates had done on site to correct the issues with the stripper condenser platform which it attributes to KSS [Doc. 76, pp. 90–92].

58

333.   Upon receipt of the backcharges documentation and proposed change order from Yates, Mr. Thelander forwarded the documentation to Mr. Weaver and his counsel on September 24 and asked for KSS's comments or questions to be returned within five days [Pl. Ex. 47].   He further advised that Rosenblad "hold[s KSS] completely responsible for these backcharges due to the faulty delivery and this is in addition to what we have already provided for backcharges previously" [*Id.*].  KSS never responded.

334.   Mr. Weaver believed that there should not have been any "major rework" to the platforms and grating as described in the proposed change order [Doc. 78, p. 157].

335.   As far as Mr. Weaver was concerned, the "major rework" was that Yates requested that KSS provide the channel piece, which KSS had done [*Id.* at 156].

336.   Meanwhile, Ms. Dishner testified that she believed the work Yates did was necessary and reasonable and that the costs Yates incurred were reasonable despite her lack of recollection of the specific issues related to the platforms and the rework [Doc. 75, pp. 171–72].

337.   While Ms. Dishner testified that the various issues she observed with the steel "absolutely" required "major rework," her response was in reference to the issues that she personally identified and captured in her photographs [*Id.* at 167–68].   As a result, the Court does not consider Ms. Dishner's testimony to be persuasive on this issue.

**L.     KSS's Notice of Lien**

338.   On or about August 13, KSS sent Rosenblad a Notice of Non-Payment pursuant to Tenn. Code Ann. § 66-11-145 wherein it claimed Rosenblad owed KSS

59

$61,480.68 for its work, labor, services, and materials supplied on the Project [Pl. Ex. 42; Doc. 63 ¶ 34].

339. On September 3, Rosenblad's counsel responded to KSS's Notice of Nonpayment and asserted that KSS's claim for $61,480.68 was not factually supported [Pl. Ex. 42; Pl. Ex. 43].

340. In that correspondence, Rosenblad offered its own calculation of what it believed KSS was owed: $45,421.68 without calculating backcharges and liquidated damages [Pl. Ex. 42; Pl. Ex. 43; Doc. 74, pp. 108–09].

341. Rosenblad also requested that KSS confirm whether it agreed with Rosenblad's calculation or otherwise provide an explanation of how KSS reached its demand for $61,480.68 [*Id.*]. KSS never responded.

342. On October 16, KSS recorded a Notice of Lien in Monroe County, Tennessee on the property where the Project is situated in the amount of $61,480.68, pursuant to Tenn. Code Ann. § 66-11-101, *et seq.* [Pl. Ex. 44; Doc. 74, p. 111].

343. On October 30, Rosenblad's counsel responded to the Notice of Lien, claiming the lien was knowingly, willfully, and grossly overstated by KSS [Doc. 63 ¶ 39; Pl. Ex. 45].

344. In the October 30 correspondence, Rosenblad demanded that KSS remove the lien and pay Rosenblad in the total amount of $174,185.12 for liquidated damages, backcharges, and labor costs and materials expenses incurred by Rosenblad during the Project [Pl. Ex. 45].

60

345.    Rosenblad advised that Yates demanded that Rosenblad bond off KSS's lien, and if KSS did not remove the lien, forcing Rosenblad to bond it off, Rosenblad would "assess all bond premium charges against [KSS]" [*Id.*].

346.    To date, KSS has not sought to enforce, amend, or release the lien [Doc. 74, pp. 111–12; Doc. 78, p. 207].

## III.    Outstanding Evidentiary Objections

### A.    Rosenblad's Backcharge Exhibits

At trial, KSS objected to two of Rosenblad's exhibits for lack of authenticity and foundation [Doc. 74, pp. 115–17]. KSS objected to part of Exhibit 47, a proposed change order, observing that it is unsigned without an attached email to show who it came from, when it was sent, and who prepared it [*Id.* at 117]. KSS raised the same objection to Exhibit 48, which is an invoice from Rosenblad to Yates for services Rosenblad provided under the parties' contract [*Id.* at 120; Pl. Ex. 48]. That invoice denotes a backcharge assessed against Rosenblad in the amount of $76,216.05 and is dated June 15, 2021 [Pl. Ex. 48; Doc. 74, pp. 120–21].

"To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). "The burden to authenticate under Rule 901 is not high." *Safely v. BMW of N. Am., LLC*, No. 20-CV-00366, 2021 WL 409722, at *3 (S.D. Cal. Feb. 5, 2021) (quoting *United States v. Recio*, 884 F.3d 230, 236 (4th Cir. 2018)). Rule 901(b)(1) allows this burden to be satisfied with testimony from a

witness with knowledge that the "item is what it is claimed to be." Fed. R. Evid. 901(b)(1).

At trial, the Court provided KSS the opportunity to further address its objections in post-trial briefing [Doc. 74, p. 117], but KSS has provided no such additional argument on the matter. To the extent KSS's objections remain, they are **OVERRULED**.

As to Exhibit 48, Mr. Thelander testified that he personally reviewed and approved the invoice before it was paid [*Id.* at 120] and described its contents "sufficient to support a finding" that the document is what Rosenblad claims it is: an invoice between Rosenblad and Yates reflecting a backcharge against Rosenblad by Yates in the amount of $76,216.05.[19] *See* Fed. R. Evid. 901(a).

Likewise, Rosenblad sufficiently laid the foundation for the proposed change order attached to Exhibit 47. Mr. Thelander explained that the proposed change order was provided to him by Yates in September and related to backcharges in the amount of $70,720.60 for KSS's defective work related to the stripper condenser platforms and grating [Doc. 74, pp. 116–18]. He believed that someone from Yates created the document [Doc. 75, p. 111].

Indeed, as Exhibit 47 further indicates, a Yates representative sent an email to Mr. Thelander on September 24 to which supporting documentation was attached and

---

[19] The Court observes the backcharged amount in Exhibit 48 is higher than the amount in the proposed change order in Exhibit 47, in the amount of $70,720.60, which is the amount that Rosenblad seeks to recover from KSS in the instant lawsuit. Mr. Thelander explained the amount in Exhibit 48 represented the total backcharge amount Rosenblad owed Yates, which included approximately $7,000 of work that Rosenblad performed for Yates that was separate from KSS's obligations [Doc. 74, p. 121].

depicted the "costs for all the issues around the structural steel," which included the proposed change order [Pl. Ex. 47]. The proposed change order bears a date in July, which Mr. Thelander believed to be a mistake, since the alleged defective work came to light in August [Doc. 75, pp. 109–10].[20] Further, it was unsigned because it was a proposed change order created by Yates for Rosenblad's review. Mr. Thelander explained that the official change order on which this proposed change order was based was signed by Yates's Vice President [*Id.* at 111–12; *see also* Pl. Ex. 49].

Rosenblad further laid the proposed change order's foundation through Ms. Dishner's testimony. Ms. Dishner identified the proposed change order, which she claims to have first seen in July [Doc. 75, pp. 167–68, 224]. Even though Ms. Dishner did not write it [*id.* at 224], she testified that Yates's project manager determined the cost of the proposed change order, and she assisted in gathering information for it [*Id.*].

In light of the above, the Court will not exclude Exhibits 47 or 48 for lack of foundation and authenticity, as Rosenblad presented enough proof "sufficient to support a finding" that the documents were what Rosenblad claimed them to be. *See* Fed. R. Evid. 901(a).

### B. Text Message

KSS also objected to a portion of Rosenblad's Exhibit 71 [Doc. 78, pp. 200–02]. The exhibit is an email thread between Mr. Thelander and KSS representatives to which Mr. Thelander attached what appears to be a screenshot of a text message [Doc. 76, p.

---

[20] While the mistaken date may impact the strength of the proposed change order as evidence, it does not necessarily impact the Court's determination as to the authenticity of the document.

63

121].  Mr. Thelander believed the text messages were between Josh "Hoss" Gambill of Yates, and Mr. Mackie [*Id.*].

At trial, KSS argued that the screenshotted text message lacks foundation because neither the sender nor the receiver was present to verify who sent and received the message or confirm that the screenshot reflected a real text exchange between those individuals [Doc. 78, p. 201].  In response to KSS's objection at trial, Rosenblad claimed it intended to use the screenshot to impeach Mr. Weaver, but otherwise did not respond to the substance of KSS's objection [*d.* at 202].  Nevertheless, it appears that Rosenblad intends to use the text message as evidence that Travis Weaver went to the Project site but did not measure all of the platforms[21] and lied to Rosenblad that Yates's representatives verified his measurements [Doc. 76, p. 153; *see also* Doc. 81, pp. 13–14].

KSS argument is well-taken, and its objection is **SUSTAINED**.  Because Rosenblad failed to present proof "sufficient to support a finding" that the screenshot was a text message conversation that occurred between Mr. Mackie and Mr. Gambill, *see* Fed. R. Evid. 901(a), the Court will not consider it in the following analysis.

## IV.    Conclusions of Law

Rosenblad alleges the following causes of action against KSS: breach of contract; breach of warranty; negligence; and violation of Tenn. Code Ann. §§ 66-11-135 and 139 [Doc. 1, pp. 5–8].  In its counterclaim, KSS raises claims for breach of contract and quantum meruit against Rosenblad [Doc. 13, pp. 15–16].

---

[21]  As the Court found *supra*, the evidence introduced at trial—and without considering the text message—reveals that Travis Weaver measured only the lower platform [Pl. Ex. 75].

64

**A.       Rosenblad's Breach of Contract Claim**

Rosenblad seeks to recover $72,000 in liquidated delay damages as a result of delays occasioned by KSS throughout the Project and because of KSS's failure to deliver the steel before May 15, the day on which PO-1's liquidated damages provision was triggered [Doc. 82, p. 24].   KSS argues that Rosenblad is not entitled to liquidated damages because the parties waived the "time is of the essence" provision in PO-1, and in the alternative, the doctrines of estoppel and unclean hands apply and preclude Rosenblad's recovery [Doc. 80, pp. 16–20].

### i.       Delay Damages – Waiver

1.       The Court first considers whether Rosenblad's conduct after each of KSS's breaches of PO-1 constituted a waiver of Rosenblad's right to terminate PO-1 under the "time is of the essence" provision.

2.       The question of whether failing to timely complete performance constitutes a material breach depends on whether time is of the essence with respect to the contract. *See Shepherd v. Perkins Builders*, 968 S.W.2d 832, 833 (Tenn. Ct. App. 1997).

3.       "[A] contract providing that time is of the essence is enforceable, and failure to meet the specific and explicit time requirements constitutes a breach[,] which permits the non-defaulting party [] to terminate the contract."  *Alexander & Shankle, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, No. M2006-01168, 2007 WL 2316391, at *9 (Tenn. Ct. App. Aug. 13, 2007).

4.       Waiver is an affirmative defense, meaning that KSS, having raised the issue of waiver, has the burden of proving it by a preponderance of the evidence

65

[Doc. 13, p. 11]. *Madden Phillips Const., Inc. v. GGAT Dev. Corp.*, 315 S.W.3d 800, 813 (Tenn. Ct. App. 2009) (citing *Jenkins Subway, Inc. v. Jones*, 990 S.W.2d 713, 722 (Tenn. Ct. App. 1998)). To satisfy this burden, KSS must present proof of some "absolute action or inaction inconsistent with the claim or right waived." *Id.* (quoting *Jenkins Subway, Inc.*, 990 S.W.2d at 722).

5.     Tennessee law recognizes that a party may waive its right to insist on strict performance of a contractual provision impliedly by conduct. *Id.* at 818 (citing *Harlan v. Hardaway*, 796 S.W.2d 953, 959 (Tenn. Ct. App. 1990)). This principle applies to the time within which a party must complete contractual duties. *Id.* A promissee may not terminate a contract and sue for breach when the promissee has either waived or caused the promisor's delay of performance. *Id.* at 818–19.

6.     The non-defaulting party may "by conduct indicating an intention to regard the contract as still in force after the other party's default, waive a provision in the contract making time of the essence." *Id.*

7.     In the context of construction contracts, "an owner, knowing construction will not be completed before the deadline, who allows the contractor to continue working after the deadline and encourages the contractor to finish the job, waives his right to terminate under a 'time is of the essence' provision." *Alexander & Shankle, Inc.*, 2007 WL 2316391, at *9.

8.     KSS argues that the parties waived and disregarded both the "time is of the essence" provision in PO-1 and PO-1's schedule in its entirety [Doc 79, p. 7; Doc. 80, p. 16]. It attempts to clarify its position, asserting, without any legal support, that by

66

waiving the "time is of the essence" provision and the schedule, Rosenblad necessarily

waived the liquidated damages provision in PO-1 [Doc. 79, p. 17]. KSS further contends

that, after waiving and disregarding the schedule, the parties did not modify the schedule

despite having discussions about it on several occasions [*Id.*].

9.      Conversely, Rosenblad maintains that it never waived or disregarded the

schedule or the timing provision after KSS breached PO-1 by failing to timely complete

detailing and deliver the steel [Doc. 81, pp. 23–24]. To the contrary, it observes that KSS

reaffirmed the schedule set forth in PO-1 in Mr. Lester's April 22 "schedule update"

email, signaling to Rosenblad that KSS would timely deliver the steel before the

liquidated damages provision was triggered on May 15 [*Id.* at 21].

**Detailing Breach**

10.     While it is undisputed that KSS did not complete detailing by March 5, and

accordingly breached PO-1 [Doc. 47, pp. 12–13],[22] Rosenblad substantially contributed

to KSS's overall delay in returning completed shop drawings, which in turn delayed its

own ability to timely return approvals.

---

[22]      In denying Rosenblad's motion for partial summary judgment, the Court held that
KSS breached PO-1 by failing to complete detailing by March 5 [Doc. 47, pp. 9–12]. To the
extent that KSS argues that it met the deadline in PO-1 and did not breach PO-1 [Doc. 80, p. 16
(arguing that it did not breach PO-1)], the Court cannot consider such argument in light of KSS's
responses to requests for admission and the Court's prior ruling on Rosenblad's motion for
partial summary judgment. "[A]n admission that is not withdrawn or amended cannot be
rebutted by contrary testimony or ignored by a district court." *Chao v. Meggitt*, No.
3:04CV7396, 2006 WL 2252526, at *2 (N.D. Ohio Aug. 4, 2006) (quoting *Metzler v. Lykes*, 972
F. Supp. 1438, 1443 (S.D. Fla. 1997) (citation omitted)). The admission is "therefore an
unassailable statement of fact" that is "binding" on (i.e., not disputable by other evidence by) the
admitter. *Cont'l Ref. Co., LLC v. Hartford Steam Boiler Inspection & Ins. Co.*, 350 F. Supp. 3d
601, 610 (E.D. Ky. 2018), *aff'd*, 769 F. App'x 355 (6th Cir. 2019). *See also Armes v. Wren*, No.
3:05-CV-459, 2007 WL 1138448, at *5 (E.D. Tenn. Apr. 16, 2007).

11.   Moreover, Rosenblad's conduct after KSS returned approvals on March 9 demonstrates that it waived the time is of the essence provision in PO-1 and its right to insist on strict performance of the detailing deadline.

12.   After the March 5 detailing deadline passed, and KSS provided the 2.28 Drawings to Rosenblad on March 9, the evidence clearly demonstrates that both parties continued to work together and wanted to move the Project forward.

13.   For example, it is undisputed that issues with Rosenblad's design drawings were discovered and remedied by both parties after KSS breached PO-1.

14.   Further, KSS continued working on detailing (and was encouraged to continue working on detailing by Rosenblad) after the March 5 deadline passed.

15.   KSS sent Rosenblad two additional RFIs, to which Rosenblad reviewed and responded, while Rosenblad simultaneously continued working on approvals and returning comments on 3D's shop drawings.

16.   This ongoing back-and-forth between the parties establishes that Rosenblad allowed KSS to continue its work on the Project despite KSS's breach and encouraged it to finish the job. *See Alexander & Shankle, Inc.*, 2007 WL 2316391, at *9.

17.   Moreover, between March 5 and April 17, Rosenblad issued eight payments to KSS for its work on the Project, indicating that Rosenblad believed PO-1 was still in force despite KSS missing the March 5 deadline [Pl. Ex. 80, p. 12].

18.   Indeed, despite KSS's breach, Mr. Thelander testified that Rosenblad wanted KSS to continue performing, which further supports the Court's finding that Rosenblad's conduct post-breach "indicat[ed] [its] intention to regard the contract as still

68

in force after [KSS's] default, [thereby] waiv[ing the] provision in [PO-1] making time of the essence" as to detailing. *See id.*

19. Based on Rosenblad's conduct, KSS, in turn, believed that Rosenblad also wanted KSS to continue performing [Doc. 78, pp. 53–54].

20. To the extent detailing continued beyond KSS's return of the 2.28 Drawings on March 9, Rosenblad substantially contributed to the delays in KSS's ability to complete detailing, which in turn, delayed the approvals process.

21. Indeed, Ms. Pettersen testified that both RFI 1 and RFI 2 impacted KSS's ability to complete detailing, even apportioning delay days to Rosenblad, though the Court questions Ms. Pettersen's overall apportionment of delay days between the parties.

22. Based on the evidence actually introduced at trial (and the Court's own calculations pursuant to Ms. Pettersen's methodology), Rosenblad may have been responsible for more than 25 delay days in the detailing process, which in turn, would have an impact on delays downstream [*see* Doc. 76, pp. 181–82].

23. As the Court found *supra*, the evidence demonstrates that Rosenblad's contribution to the overall delay on the Project, including the delays in the detailing and approvals stages, is more extensive than Rosenblad has posited. *See Madden Phillips Constr., Inc.*, 315 S.W.3d at 821 (finding the record supported the trial court's conclusion that the defendant's conduct "caused a substantial delay" in the completion of the project, which in turn supported the trial court's conclusion that the defendant waived the timing provision in the parties' contract).

69

24.     In light of the above, the Court finds that Rosenblad waived the time is of the essence provision as to the detailing deadline.  There is more than sufficient proof of "absolute action or inaction" by Rosenblad that was "inconsistent with the claim or right waived." *See id.* at 813 (citing *Jenkins Subway, Inc.*, 990 S.W.2d at 722).

**Steel Deliveries Breach**

25.     Despite having waived the timing provision as to KSS's initial breach, the Court must address the trickier issue of whether Rosenblad also waived the timing provision as to KSS's deliveries under PO-1 and the schedule in its entirety.

26.     It is undisputed that KSS breached PO-1 when it failed to deliver all steel under PO-1 before May 7 [*see* Doc. 47, p. 13].

27.     Rosenblad seems to argue that KSS's April 22 email represents a written modification or "reaffirmation" of the schedule in PO-1, though it simultaneously maintains that it never agreed to modify the delivery dates in the schedule [Doc. 81, pp. 7].  To the extent it makes such argument, it offers no legal authority or argument to explain its position.

28.     Meanwhile, KSS ignores the April 22 email altogether and maintains that the parties waived and disregarded the schedule in its entirety.

29.     KSS failed to meet its burden in proving that Rosenblad waived the "time is of the essence" provision as to the delivery deadline in PO-1 and the schedule in its entirety.

30.     After KSS's initial breach, Rosenblad did not comply with the approval deadline set forth in PO-1, having returned substantially complete approvals on April 14

and 15, nearly one month late. Rosenblad's noncompliance with the schedule does provide some support for KSS's argument that Rosenblad waived the timing provision as to the remaining deadlines under PO-1.

31.     In its post-trial briefing, Rosenblad submits that the "parties agreed that Rosenblad was excused from providing approvals in accordance with" PO-1 after KSS first breached the contract by failing to provide complete detailing by March 5 [Doc. 82 ¶ 142]. In support of this assertion, Rosenblad points to its communication to KSS, after neither party complied with their respective deadlines, that they would revisit the schedule once they made it through the approval process [*Id.* ¶¶ 142–45].[23] Indeed, this statement demonstrates that Rosenblad was keenly aware that the first two deadlines under PO-1 were not timely met by either party, and yet Rosenblad intended to move forward on the Project while it affirmatively continued working with KSS.

32.     However, KSS's own subsequent conduct cuts against its waiver argument. After approvals were returned, the parties did in fact look at the schedule again. Following a telephone conversation with Mr. Mackie, Mr. Lester sent the April 22 email, informing Rosenblad that KSS would deliver the complete steel package on May 4, and that the handrails and stairs under PO-1 would be delivered before May 15, the day on which liquidated damages would start accruing under PO-1.

33.     Notably, the April 22 email was sent *after* (1) Rosenblad returned substantially complete approvals on April 14 and 15, (2) the three RFIs were resolved,

---

[23] KSS believes that this communication is proof that the parties completely disregarded the schedule [Doc. 79, p. 7]. However, as explained *infra*, other evidence refutes this contention.

Case 3:20-cv-00511-TAV-JEM   Document 84   Filed 03/28/24   Page 71 of 110   PageID #: 3322

and (3) KSS worked over the weekend and claimed to accrue overtime. At the time the email was sent, KSS therefore had the opportunity to account for the impact of prior delays on the Project and determine how long fabrication and deliveries would take and whether it could meet the delivery deadlines set forth in PO-1. Indeed, the April 22 email must be read in such context.

34. KSS, presented with the opportunity to inform Rosenblad it could not meet the delivery schedule because of previous delays on the Project, instead informed Rosenblad that it would deliver the steel mostly in accordance with the original schedule and before the liquidated damages provision was triggered.

35. The April 22 email also discredits KSS's position that the parties disregarded the original schedule in its entirety. To the contrary, the dates provided by Mr. Lester largely track the original deadlines established under PO-1. If anything, they indicate that KSS had the original schedule in mind and at least intended to deliver the steel under PO-1 before the liquidated damages provision was triggered.

36. While Mr. Weaver may have believed that the dates set forth in the April 22 email were "tentative delivery dates" [Doc. 78, pp. 79–80], Mr. Lester's statements led Rosenblad to reasonably believe that the previous delays did not impact KSS's ability to fabricate and timely deliver the steel under PO-1 and before the liquidated damages provision was triggered on May 15 [Doc. 82 ¶ 146].

37. At that point, despite prior delays and Rosenblad's waiver as to the timing provision of the detailing deadline, it cannot be said that Rosenblad knew the deliveries

would "not be completed before the deadline." *See Alexander & Shankle, Inc.*, 2007 WL 2316391, at *9.

38.     Even though Mr. Weaver subjectively knew at the time that KSS would not be able to timely deliver the steel under PO-1, based on KSS's conduct and representations on and after April 22, Rosenblad did not have reason to anticipate that the deliveries would be late.  For all Rosenblad knew after April 22, KSS could fabricate the steel and timely deliver the product to the Project site.

39.     In fact, after KSS's "schedule update" on April 22, KSS did not seek an extension or modification of the schedule or communicate any further concerns it had about the schedule to Rosenblad. *Cf. id*. at *2–4 (finding waiver where the plaintiff requested that the schedule be extended several times).

40.     Even though it was discovered that ten stainless-steel gusset plates were removed from KSS's scope of work and put back in by Rosenblad after the April 22 email, KSS offered no proof demonstrating that Rosenblad knew or had reason to know that the mistake would delay its ability to timely deliver the other steel members under PO-1. *See id.* at *9.  Indeed, there is no evidence of KSS relaying any concerns about the delivery schedule after April 22.

41.     In light of the above, and given KSS's representations to Rosenblad and its conduct on and after April 22, it cannot be said that Rosenblad knew or had reason to know that KSS's fabrication process and steel deliveries would be late despite prior delays in the schedule. *See id.*  KSS has not met its burden in proving that Rosenblad waived the timing provision as to the steel deliveries or the schedule in its entirety.

42. Finally, Rosenblad was not required to give KSS notice and the opportunity to cure for its default. *See id.* (explaining that notice and an opportunity to cure are not required where the relevant default is for breach of a time of the essence clause, as the notice requirement has "no application to such a default").

43. The Court concludes that KSS is liable for breach of contract for failing to timely deliver the steel under PO-1.

### ii. Liquidated Damages

30. Under Tennessee law, "[l]iquidated damages will not be awarded to one that has contributed to or mutually caused the delay or breach." *Suitt Const. Co. v. Ripley's Aquarium, LLC*, 108 F. App'x 309, 315 (6th Cir. 2004) (citing *Airline Constr., Inc. v. Barr*, 807 S.W.2d 247, 262 (Tenn. Ct. App. 1990)).[24]

31. The Tennessee Court of Appeals recently observed, "case law instructs that it would matter not if [the party seeking to avoid liquidated damages assessed against it (KSS)] had been responsible for delays that outweighed those occasioned by [the party seeking liquidated damages (Rosenblad)]." *E Sols. for Buildings, LLC v. Knestrick Contractor, Inc.*, No. M2018-02028-COA-R3-CV, 2019 WL 5607473, at *9 (Tenn. Ct. App. Oct. 30, 2019).

---

[24] The Court observes that while neither party directly addressed this crucial principle of Tennessee law, but both present extensive argument and discussion related to the causes and impact of delay on the Project [*see, e.g.*, Doc. 80, pp. 19–20; Doc. 82, pp. 14–18]. Specifically, KSS contends the delays occasioned by Rosenblad prevented KSS from timely fabricating and delivering the steel under PO-1 in the context of its unclean hands defense [Doc. 80, p. 20]. As a result, the Court will consider such arguments in the context of the above legal principle.

74

32.     The Court concludes that Rosenblad cannot recover liquidated damages from KSS.  *See Suitt Const. Co.*, 108 F. App'x at 315 (citation omitted).

33.     The evidence at trial reflects that Rosenblad contributed to a portion of the overall delay on the Project.  Specifically, Rosenblad substantially contributed to the detailing delay, and thereafter was delayed itself in returning approvals, which necessarily impacted KSS's ability to timely fabricate and deliver steel under PO-1.  *See id.*

34.     Based on the proof presented at trial, the Court has found *supra* that Rosenblad contributed to more extensive delays than KSS in the detailing stage.  Indeed, it is undisputed that Rosenblad's response time to RFI 1 and RFI 2 hindered KSS's ability to complete detailing.  The only clear evidence of KSS's contribution to the delay is that it returned the 2.28 Drawings four days late under the original deadline set forth in PO-1.

35.     KSS argues that Rosenblad's delay in timely returning approvals prevented KSS from fabricating and delivering steel within the original timeframe allotted to it under PO-1 [Doc. 80, p. 20].  In support, KSS relies on Mr. Weaver's trial testimony, as Mr. Weaver was the only witness with personal knowledge of KSS's steel fabrication process and the impact of prior delays on KSS's ability to fabricate the steel [Doc. 78, p. 187].  The Court considers Mr. Weaver's testimony to be credible on this matter given his direct involvement with and oversight of the fabrication process on the Project.

36.     While KSS began to fabricate the smaller members at the end of March, it could not begin fabricating the main members on the Project until after April 14 and 15,

75

when Rosenblad provided approved shop drawings for those parts, nearly one month after they were due under the original schedule.

37.     Mr. Weaver explained that KSS would not begin ordering materials for fabrication until Rosenblad returned approved shop drawings, as dimensions continued to change on the shop drawings.  Ordering the materials without approved shop drawings in this case could prove costly [Doc. 78, pp. 7–8].

38.     Under the original schedule, KSS had 56 days to order material and fabricate before the liquidated damages provision was triggered (from March 19 through May 14).  Having received substantially complete approvals on April 14 and 15 because of delays occasioned primarily by Rosenblad, KSS's fabrication timeline was nearly cut in half.  These circumstances lend additional credibility to Mr. Weaver's testimony that KSS could not have fabricated and timely delivered all the steel—particularly the main members of the structure—because of prior delays primarily occasioned by Rosenblad.

39.     Moreover, it is undisputed that Rosenblad's mistake in removing the ten stainless-steel gusset plates from KSS's scope of work caused a delay in KSS's ability to timely order and fabricate those parts, necessarily impacting the timing of their delivery [Doc. 75, pp. 51–52].

40.     In light of the above, because Rosenblad occasioned delays on the Project that contributed to KSS's delay in performing and timely delivering the steel under PO-1, Rosenblad is precluded from recovering liquidated damages from KSS.  *See Airline Constr., Inc.*, 807 S.W.2d at 262.

41.    The fact that KSS did not attempt to quantify the delays on the Project with mathematical precision does not necessitate a different result.  *See E Sols. for Buildings, LLC*, 2019 WL 5607473, at *9.

42.    Tennessee case law suggests that such exactitude is not required.  *See id.* Indeed, the Tennessee Court of Appeals has indicated that it is irrelevant if the party seeking to avoid liquidated damages is responsible for more delays than the party seeking to recover liquidated damages.  *See id.  See also Airline Constr., Inc.*, 807 S.W.2d at 262.

43.    Here, the evidence preponderates in favor of a finding that Rosenblad substantially contributed to the delays occasioned in the detailing and approvals stages of the Project, which in turn impacted KSS's ability to timely fabricate and deliver steel before PO-1's liquidated damages provision was triggered.

44.    It makes no difference if KSS's overall delay outweighed Rosenblad's.  *See E Sols. for Buildings, LLC*, 2019 WL 5607473, at *9.

45.    Although Rosenblad is precluded from recovering liquidated damages, it could have recovered "actual" delay damages for KSS's breach, but "absent proof of such damages there can be no award."  *Airline Constr., Inc.*, 807 S.W.2d at 262 (internal quotation marks and citation omitted).

46.    Because Rosenblad has not offered proof of actual delay damages, the Court will not award actual delay damages.  *See id.*

77

### iii.     Defective Work and Negligent Construction

47.     Rosenblad argues that KSS breached (1) PO-1 and PO-2 by delivering defective materials to the Project site and (2) its common law duty to perform in a good and workmanlike manner [Doc. 81, pp. 15, 17].[25]

48.     As a result, Rosenblad seeks to recover from KSS $7,548 in direct costs for time and materials resulting from KSS's defective performance [Doc. 82, p. 26].

49.     The evidence presented at trial demonstrates that such costs[26] included $13.17, $1,359.20, $554.20, $134.60, and $5,151.66, for a total sum of $7,212.83, not $7,548.

50.     Rosenblad also seeks to recover backcharges from Yates in the amount of $70,721.00 [*Id.* at 26–27].

51.     As a general rule, a party alleging defects in the performance of a contract must, when reasonable, give notice and a reasonable opportunity to cure such defects. *Forrest Const. Co. v. Laughlin*, 337 S.W.3d 211, 229, 230–31 (Tenn. Ct. App. 2009) (citing *Carter v. Krueger*, 916 S.W.2d 932, 935 (Tenn. Ct. App. 1995)).   The same principle applies to claims for negligence in the context of defective work. *Id.*

---

[25]     In its post-trial brief, Rosenblad acknowledges damages would be duplicative and concedes that they should not be awarded under both a breach of contract and negligence theory [Doc. 81, p. 17 n.4].

[26]     Rosenblad asserts in its post-trial briefing that it accrued such costs in the amounts represented above, which corresponds with the amounts proven at trial and equals $7,212.83 based on the Court's math [Doc. 82, pp. 18–19].   It appears the total amount requested by Rosenblad may have been an error.   The Court observes that Rosenblad likely relied on Ms. Pettersen's report, who calculated total costs in the amount of $7,548, which does not align with the costs that were proven at trial [Pl. Ex. 80].

78

52.    This principle "allow[s] the defaulting party the opportunity 'to repair the defective work, to reduce the damages, to avoid additional defective performance, and to promote the informal settlement of disputes.'"  *Custom Built Homes by Ed Harris v. McNamara*, No. M2004-02703-COA-R3CV, 2006 WL 3613583, at *5 (Tenn. Ct. App. Dec. 11, 2006) (quoting *Carter*, 916 S.W.2d at 935).

53.    There are circumstances under which the duty to give notice and an opportunity to cure is excused.  *See Greg Calfee Builders LLC v. MaGee*, 616 S.W.3d 545, 555–56 (Tenn. Ct. App. 2020).  "If, for instance, a contractor simply walks off a job, or is entirely incompetent, the requirement may be excused.  In those circumstances, the builder has not merely been deficient in one detail or another on a project, but has demonstrated an unwillingness or complete inability to do the job. In that case, an opportunity to cure would be futile."  *Id.* at 556.

### 1.    Rosenblad's Invoices for Time & Materials

#### a.    Invoices from June and July

54.    Throughout June, upon receiving notice of defects in the steel as observed by Yates and Rosenblad, the proof presented at trial demonstrates (and Rosenblad agrees) that KSS was responsive in repairing and curing such defects.

55.    While there were defects observed in the steel in June, KSS cured the defects of which it had notice and the opportunity to cure.

56.    Yet Rosenblad seeks to recover $2,061.17 from KSS for purchases Rosenblad made in June and July because of defects that were discovered in the steel.

79

57.     Rosenblad purchased additional parts from other suppliers from June 28 through June 30 in the total amount of $1,926.57 and claims it did so because of KSS's defective work in June [Pl. Ex. 31; Pl. Ex. 32; Doc. 74, p. 91; Doc. 76, pp. 54–55, 58–59; Pl. Ex. 33].

58.     Rosenblad also seeks to recover $134.60 from KSS for stainless steel nuts and bolts it purchased on July 31 because Mr. Thelander claimed they were not delivered to the Project site [Pl Ex. 36; Pl. Ex. 37].

59.     As to the invoice from Londerville for $13.17 for two flat bars, Mr. Thelander could not recall where the pieces fit into the Project, despite Rosenblad's assertion in its post-trial briefing that they were never delivered [*see* Doc. 82, p. 12].

60.     As to the invoice for $1,359.20 for a pipe from Eastern Industrial Supply, Mr. Thelander testified that the pipe delivered by KSS was rejected because the quality was so bad, despite Rosenblad's assertion in its post-trial briefing that the pipe was not delivered [*Id.*].

61.     Rosenblad presented no credible evidence demonstrating that KSS was made aware of defects in or issues with the particular parts for which Rosenblad made the above purchases.

62.     To the extent Rosenblad claims it purchased parts that KSS did not deliver to the Project site, Rosenblad presented no evidence that KSS was given notice or an opportunity to cure (i.e., deliver the missing items) before Rosenblad made such purchases, which could have allowed the parties to avoid the damages now claimed.  *See*

80

*Custom Built Homes by Ed Harris*, 2006 WL 3613583, at *5 (quoting *Carter*, 916 S.W.2d at 935).

63.    Without giving KSS notice and the opportunity to cure, Rosenblad is precluded from recovering for the purchases it made in June and July in the total amount of $2,061.17.

#### b.    Grating Invoice in August

64.    Rosenblad also seeks to recover $5,151.66 from KSS for grating Rosenblad purchased on August 28.  The defective grating was photographed by Ms. Dishner and sent to Rosenblad on August 20 [Pl. Ex. 41; Doc. 74, pp. 105–06, 145].

65.    The primary issue with the grating is not that it was defective, but whether KSS was given notice and the opportunity to cure.

66.    Rosenblad is precluded from recovering those costs because KSS was neither provided notice nor the opportunity to cure the grating defects.

67.    Mr. Thelander generally testified that the handrails and grating issues were discussed with KSS, but he was not directly part of any such discussions that he believed transpired between Rosenblad and KSS representatives about the grating issues.

68.    While Mr. Thelander believed the information in Ms. Dishner's August 20 email was forwarded to KSS, Rosenblad presented no credible evidence to corroborate his testimony [Doc. 75, p. 70].

69.    While Ms. Dishner showed KSS representatives various issues with the steel while they were on-site in June, including previous issues with the grating, there is no evidence that she or anyone from Yates met with KSS representatives during their site

81

visit on August 21 to show them the issues with the grating that she photographed and sent to Rosenblad on August 20.

70.     Mr. Weaver, who went to the Project site on August 21 to help Yates install the stripper condenser platforms, testified that he was not made aware of any issues with the grating, which were already installed on an elevated surface, and that he only observed the platforms on the ground.

71.     In light of the above, the proof introduced at trial does not preponderate in favor of a finding that KSS was aware of any grating issues that came to light in August.

72.     The circumstances were such that it was reasonable for Rosenblad to give such notice to KSS—either by forwarding Ms. Dishner's email to KSS representatives immediately upon receipt, which was consistent with past practice, or showing KSS the defects while Mr. Weaver was on-site on August 21.  Indeed, at the time the defects were discovered, the parties were actively communicating about issues with the stripper condenser platforms, and the very next day after Ms. Dishner notified Rosenblad of the grating defects, KSS representatives were at the Project site.

73.     To the extent Rosenblad contends that notice and the opportunity to cure would have been futile in light of Mr. Lester's communication to Mr. Thelander on August 27 that Rosenblad should no longer contact KSS, this argument is not persuasive.

74.     Had KSS been made aware of the grating issues, Mr. Weaver provided persuasive testimony that KSS could have repaired and returned the impacted pieces of defective grating within a day [Doc. 78, pp. 114–15].  Indeed, as the Court found *supra*,

KSS previously cured issues with the grating in June within one day after being made aware of such issues.

75. Thus, if KSS actually received notice of the grating issues when they were made known to Rosenblad on August 20, or on August 21 when Mr. Weaver was at the Project site, KSS could have repaired the grating before KSS ultimately abandoned the Project [Pl. Ex. 39].

76. The Court finds the facts of this case distinguishable from those in *Forrest Construction*. There, the construction company argued that the fact that the defects were repaired or discovered after litigation had commenced did not excuse the landowners from their duty to provide notice and an opportunity to cure. 337 S.W.3d at 229. The court held that, because there was both a lawsuit and a lien that predated the discovery of the defects, and that "by the time the defects were discovered, [the construction company] had already abandoned the job site," the landowners were excused from the requirement to provide notice and an opportunity to cure. *Id.* at 230–31.

77. Here, the grating defects were discovered before KSS "abandoned" the Project. Indeed, the defects were discovered while KSS was still cooperating with repair efforts and was engaging with Rosenblad and Yates to help fix the issues with the stripper condenser platforms. At that point, KSS had not demonstrated an unwillingness to "cooperate or complete inability to do the job." *See Greg Calfee Builders LLC*, 616 S.W.3d at 556. Had KSS been given notice, the evidence indicates that KSS could have cured the grating before August 27. Before that time, there is no indication that KSS would not have agreed to correct the grating if it were asked to do so.

78.     For those reasons, the Court concludes that Rosenblad was not excused from its duty to give KSS notice and the opportunity to cure as to the grating defects observed in August.

79.     As a result, Rosenblad is not entitled to recover $5,151.66 from KSS for the replacement grating it purchased on August 28.

### 2.     Backcharges from Yates – Stripper Condenser Platform

80.     Rosenblad also seeks to recover $70,720.60 from KSS [Doc. 81, p. 16] for backcharges assessed against Rosenblad by Yates for costs that Yates incurred in reworking the grating and the stripper condenser platforms.

81.     It is undisputed that the platforms would not fit to the stripper condenser vessels, and much of the parties' disagreement is whether the cause of the platform problems are attributable to Yates's assembly of the platforms on the ground or KSS's faulty fabrication of the steel parts.

82.     Rosenblad has proven by the preponderance of the evidence that the platforms were not fabricated in strict conformity with the approved shop drawings as expressly warranted in PO-1 and PO-2.

83.     Such nonconformities caused problems with the stripper condenser platforms, including the upper platform's inability to fit the vessel to which it should have attached.

84.     As a result, the Court concludes that KSS is liable for breaching the express warranties in PO-1 and PO-2.

Case 3:20-cv-00511-TAV-JEM   Document 84   Filed 03/28/24   Page 84 of 110   PageID #: 3335

85. Likewise, Rosenblad has proven that KSS breached its implied duty to perform in a workmanlike manner, thereby breaching both PO-1 and PO-2. *See Fed. Ins. Co. v. Winters*, 354 S.W.3d 287, 292 (Tenn. 2011) (observing the "failure to perform a building contract in a workmanlike manner," which includes an "implied agreement that the building or work performed will be sufficient for the particular purpose desired or to accomplish a certain result . . . constitutes a breach of the contract") (citation omitted).

86. For the same reasons, Rosenblad has also proven that KSS owed a duty to KSS to perform in a workmanlike manner, *see id.*, and breached that duty in producing nonconforming members that formed part of the stripper condenser platforms, thereby causing the platforms to not fit.

87. Contrary to KSS's position, the reason platforms did not fit was not due to the manner in which they were erected by Yates.

88. Considering the conflicting testimony of both Mr. Weaver and Ms. Dishner, the Court has already found Ms. Dishner's testimony to be more persuasive regarding the method of assembly of the platforms. Although her testimony about *why* the platforms would not fit is not particularly compelling given her lack of involvement and recollection [Doc. 75, pp. 166, 217, 220–22], the Court has credited her testimony about their assembly and installation, which supports the Court's conclusion that Yates's assembly of the platforms on the ground did not cause issues with the platforms.

89. The Court has also found that Ms. Dishner's explanation that hard steel does not "move dimensions" or grow inches in the air is more plausible than Mr.

Weaver's suggestion that steel draws and pulls in the air, which would have enabled the platforms to fit in this case [*Id.* at 169, 219; Doc. 78, pp. 145–47].

90.     It is undisputed that KSS ultimately gave Yates a channel piece to help fill a space between the upper platform and vessel.  Assuming Mr. Weaver's explanation as correct, the Court questions how assembling the platform in the air piece by piece would have allowed the steel to grow and fill the space that the channel ultimately filled, thereby enabling the platform to fit to the vessel.

91.     Rosenblad has provided uncontroverted evidence that at least 20 members (according to the Court's count and without accounting for the 13 measurements taken by Travis Weaver [Pl. Ex. 71]) that were fabricated by KSS and part of the platforms were nonconforming—i.e., they were either too long or too short, as compared to the approved shop drawings [Pl. Ex. 72].

92.     Rosenblad's engineer ultimately concluded that 27 field measurement dimensions did not match the dimensions required in the approved shop drawings [*Id.*]. Specifically, 11 members on the lower platform and 10 members on the upper platform were nonconforming—including bolts, locations of bolt holes, and channel lengths being either too short or too long [*Id.*].

93.     As the Court already found, Rosenblad's engineer measured each platform twice—first, on or around August 8, and second, on or around August 18, after Travis Weaver measured members only on the lower platform [Pl. Ex. 72].  In measuring the platforms the second time, Rosenblad's engineer confirmed the discrepancies in his initial measurements.

86

94.     Rosenblad took additional measurements beyond KSS's 13, having measured approximately 40 members on both the upper and lower platforms [Pl. Ex. 72].

95.     Rosenblad provided KSS proof of its measurements in the form of different documents and marked-up drawings [Pl. Ex. 71; Pl. Ex. 73; Pl. Ex. 76; Pl. Ex. 77; Pl. Ex. 78; Doc. 76, pp. 118–19, 123–25, 129–31].

96.     Indeed, the Court considers Rosenblad's measurements to be more comprehensive and complete than KSS's, having measured both platforms, more members on each platform, and more dimensions.

97.     As a result, the impact of certain members being too long and too short on each platform, "along with the stacked tolerances," created problems for Yates in assembling and installing the platforms [Pl. Ex. 74; Doc. 76, p. 127].

98.     The Court further credits Mr. Thelander's testimony in which he explained how, like assembling IKEA furniture, if certain holes are missing or if parts are too long, the pieces will not fit together, which is what happened in this case [*Id.*].

99.     The fact that Rosenblad did not introduce affirmative evidence showing that Yates specifically confirmed the cause of the platforms not fitting does not detract from the Court's findings.  To the contrary, Yates acknowledged in its proposed change order that the platforms were fabricated incorrectly, which is accurate [Pl. Ex. 47].

100.    Moreover, it is not the case that the steel fabricated by KSS up to that point had been flawless.  Indeed, it is undisputed that there were prior fabrication and sizing errors and other defects in KSS's steel that needed repairing throughout June.  Among

other issues, for example, is that KSS furnished bolts for the stair treads and certain washers and nuts that were the wrong sizes [Pl. Ex. 27].

101.    KSS's positioning on the matter at the time also supports the Court's conclusion.    After Mr. Thelander advised KSS of the discrepancies, KSS initially attributed blame to Rosenblad's engineering [Doc. 76, p. 125; Pl. Ex. 74], although there is no evidence to support such accusation.

102.    Then, KSS attempted to blame Yates for assembling the platforms on the ground, which, as indicated above, was not the cause of the problem.

103.    There is no evidence to support KSS's position that Yates's negligence (or the negligence of another) was the cause of the issues with the platforms [*see* Doc. 80, p. 22].

104.    Additionally, while KSS initially claimed its measurements were correct and the parts were fabricated in accordance with the approved drawings, it later shifted its position, claiming the members were fabricated within "dimensional tolerances" [Doc. 76, pp. 127–28].    Even if individual members were fabricated within dimensional tolerances, this does not refute Mr. Thelander's explanation that the problem was the overall impact of the members being too long and too short, combined with the stacked tolerances [Pl. Ex. 74; Doc. 76, p. 127].

105.    The blame shifting, together with KSS's shifting positions about the dimensions, discredits KSS's original position that it fabricated the parts in strict conformity with the approved shop drawings.

106. In light of the above, the Court concludes that Rosenblad has met its burden in proving there were discrepancies between the size of the fabricated members on the platforms and what the approved shop drawings required, which caused issues in installing the platforms (i.e., they would not fit).

107. Such discrepancies signify that KSS did not fabricate the members in strict accordance with the approved shop drawings, in breach of the express warranties in PO-1 and PO-2 [Pl. Ex. 2 ¶ 7; Doc. 63 ¶ 28], and in breach of its duty to perform in a workmanlike manner.

**Notice and Opportunity to Cure**

108. Rosenblad provided KSS notice about the issues with the platforms on August 10 and 11 after Rosenblad sent its measurements showing that certain members were too short and long as compared to the approved shop drawings [Pl. Ex. 68, Doc. 76, pp. 117–18; Pl. Ex. 67; Doc. 78, p. 119].

109. While Yates's backcharge documents indicate that Yates spent more than $9,000 in manhours (by the Court's calculation) trying to get the platforms to fit the vessels before August 10 [Pl. Ex. 47], KSS has not cited to any authority that would preclude Rosenblad's recovery on that basis, as KSS was ultimately given notice [*see* Doc. 79, pp. 10, 15]. Nor does KSS specifically cite to authority that either permits or prevents the Court from awarding amounts incurred prior to the notice.

110. Based on the forgoing, the Court does not find it appropriate to preclude Rosenblad's recovery on this basis, or preclude Rosenblad from recovering those costs.

111. After August 12, KSS was a given reasonable opportunity to cure [Def. Ex. 51; Doc. 76, p. 92].

112. Once KSS was given notice and the opportunity to cure, KSS representatives went to the Project site twice to assess the platforms' condition: Travis Weaver took measurements of the lower platform on August 13, and Mr. Weaver and Mr. Lester went on August 21 and furnished a channel for the upper platform [Doc. 78, p. 121; Doc. 76, pp. 121–22; Pl. Ex. 40; Doc. 76, pp. 72, 109].

113. To the extent KSS argues it was never informed that Yates would incur costs to fix the platforms, two emails from Mr. Thelander on August 18 indicate otherwise. Mr. Thelander reiterated to KSS on August 18 that "[a]ll costs for rectifying the structure will be back-charged to [KSS], as the re-work is necessary due to [KSS's] failure to properly manufacture the structure" [Pl. Ex. 71; Pl. Ex. 73; Pl. Ex. 76; Pl. Ex. 77; Pl. Ex. 78; Doc. 76, pp. 118–19, 123–25, 129–31]. He also informed KSS that "it is impossible to quantify the amount as we will have to get an agreement from Yates on how the modifications will be made, and may possibly incur external engineering costs as well" [*Id.*].

347. Mr. Thelander reiterated the point in a second email, stating, "We will hold [KSS] responsible for ALL the costs for rectifying this with the installer" [Pl. Ex. 74; Doc. 76, p. 127]. Nevertheless, he indicated it was "in everybody's best interest for [KSS's] to assist in making the structure to be installed as quickly and efficiently as possible" [*Id.*].

90

114.    KSS abandoned the Project on August 27 when Mr. Lester instructed Rosenblad to no longer contact KSS, and if need be, to do so through KSS's attorney [Pl. Ex. 39].    Based on that directive from KSS, it was reasonable for Rosenblad to assume that, going forward, KSS was no longer willing to cooperate with further requests to cure remaining defects that existed in the steel KSS fabricated.    *See Greg Calfee Builders LLC*, 616 S.W.3d at 555–56.    Even though KSS had previously been responsive to issues with its product, the Court finds it would have been futile for Rosenblad to contact KSS, through its attorney, and give it another chance to cure.    *See id.*

115.    As a result, Rosenblad was excused from its duty to give notice and an opportunity to cure after receiving that communication from KSS.    *See id.*

116.    However, the day after Mr. Weaver visited the Project site, Yates nevertheless accrued 55 manhours on August 22, for a total of $3,638.25 (by the Court's count), and it is unclear what work was performed, and whether the work was related to the platforms or something else (i.e., the grating, of which KSS had no notice of any issues at the time) [Pl. Ex. 47].

117.    Moreover, after August 24, when Yates was slated to lift and fit the upper platform, and before KSS abandoned the Project, Yates expended an additional 160.5 manhours, in the total amount of $7,078.05 (according to the Court's count) from August 25 through August 27 [*Id.*].

118.    The evidence does not show what work Yates performed, what work remained for Yates to complete on those days, and that KSS was aware that additional manhours were necessary beyond its supplying the channel piece and the August 24 lift

91

attempt. Based on the evidence, the Court cannot discern whether those hours are attributable to efforts to repairing the grating, which, as the Court determined *supra*, KSS lacked notice and the opportunity to cure.

119. Further, the proof offered at trial demonstrates that KSS reasonably believed that all defects associated with its work on the Project were cured before it abandoned the Project: Yates indicated that it would lift and fit the upper platform on August 24, and as far as the evidence shows, KSS did not know that the lift effort proved unsuccessful, and that additional work needed to be done.

120. As a result, the Court will exclude those amounts from what is owed to Rosenblad.

121. Specifically, the Court finds it appropriate to award Rosenblad damages for Yates's work—before KSS's abandonment of the Project—for which there is evidence indicating that Yates was repairing the platforms. Rosenblad will not be awarded the costs incurred for days on which there is insufficient evidence of the work Yates performed (i.e., August 22 and 25 through 27).

### 3. Damages

122. Having concluded that KSS (1) breached PO-1 and PO-2 by fabricating and delivering members that were not in strict conformity with the approved shop drawings, as well as its common law duty to perform in a workmanlike manner, and (2) had notice and an opportunity to cure the platforms, but not the grating, the Court must determine the amount of damages to which Rosenblad is entitled.

123. Rosenblad claims it was damaged in the amount of $70,721.00 because of KSS's defective work and justifies such damages with Yates's backcharge documentation [Doc. 82, p. 26].

124. The burden is on Rosenblad to prove its damages. *See Leedy v. Hickory Ridge, LLC*, 663 S.W.3d 537, 549 (Tenn. Ct. App. 2022), *appeal denied* (Feb. 8, 2023).

125. "Damages for breach of contract may be awarded even where it is impossible to prove the exact amount of damages." *Forrest Constr.*, 337 S.W.3d at 232 (citing *Moore Constr. Co., Inc. v. Clarksville Dep't of Elec.*, 707 S.W.2d 1, 15 (Tenn. Ct. App. 1985)). "All that is required is proof with a reasonable degree of certainty." *Id.*

126. The requirement that damages be proved with reasonable certainty does not require mathematical precision, but only requires enough proof to enable the fact finder to make a fair and reasonable assessment. *Pinson & Assoc. Ins. Agency, Inc. v. Kreal*, 800 S.W.2d 486, 488 (Tenn. App. 1990).[27]

127. Here, Rosenblad proved its damages with a "reasonable degree of certainty," thereby enabling the Court "to make a fair and reasonable assessment." *See id.*; *Forrest Constr.*, 337 S.W.3d at 232.

128. The backcharge documentation reveals that Yates claims to have incurred $70,721.00 to fix issues with the platforms and grating because they were "fabricated wrong" and "would not fit" [Pl. Ex. 47].

---

[27] KSS seems to conflate this requirement with the proposition that Rosenblad must demonstrate that its damages are reasonable [*see, e.g.*, Doc. 79, pp. 11, 15].

The Court further observes that neither party has set forth the legal standard under which the Court is to calculate and award damages.

93

129.     As an initial matter, the Court observes that the costs Yates incurred after August 27, the day on which KSS abandoned the Project, are recoverable.  As explained *supra*, further notice to KSS that the platforms did not fit would have been futile.

130.     So too is Yates's work on August 12, which appears related to the reinstallation suggestions by Mr. Antkiewicz on August 7 and 8 [*Id.*; Def. Ex. 51; Doc. 75, p. 83].     Indeed, Yates's backcharge documentation indicates that Yates's representatives worked with Mr. Antkiewicz that day on the platforms [Pl. Ex. 47].

131.     As discussed *supra*, the Court will not preclude Rosenblad's recovery of the costs incurred by Yates before KSS was notified of the issues related to the platforms.

132.     Further, based on the proof introduced at trial, it is reasonable to assume that Yates spent the manhours it worked on August 21, the day on which Mr. Weaver visited the Project site, and August 24, the day on which Yates advised that it would lift and fit the upper platform with the channel piece.

133.     In light of the above, the Court finds KSS is liable to Rosenblad in the amount of $58,932.67.  This amount excludes the manhours worked on August 22 and August 25 through 27, and accounts for an adjusted overhead cost of 10% [*Id.*].

## **Mitigation**

134.     KSS also argues that Rosenblad failed to mitigate its damages because Rosenblad and Yates did not immediately notify KSS when it was discovered that the platforms were not fitting to the vessels [Doc. 80, p. 23].  Indeed, KSS observes that a portion of the manhours listed on Yates's backcharge documentation pertained to Yates's efforts to determine why the platforms were not fitting in the first place, which were

94

incurred before KSS visited the site [Doc. 79, p. 14]. KSS also argues that Rosenblad and Yates failed to employ KSS's recommendations to resolve the issues with the platform in a cost-effective manner [Doc. 80, p. 23].

135.  The failure to mitigate damages is an affirmative defense, and KSS carries the burden to produce proof to show that Rosenblad's losses "could have been avoided by reasonable effort and expense." *See Westfield Ins. Co. v. Rainey Contracting, LLC*, No. 2:15-CV-247, 2017 WL 2484273, at *5 (E.D. Tenn. June 8, 2017) (quoting *Action Ads, Inc. v. William B. Tanner Co., Ind.*, 592 S.W.2d 572, 575 (Tenn. Ct. App. 1979)); *Tampa Elec. Co. v. Nashville Coal Co.*, 214 F. Supp. 647, 652 (M.D. Tenn. 1963).

136.  The doctrine provides, "[O]ne who is injured by the wrongful or negligent act of another, whether by tort or breach of contract, is bound to exercise reasonable care and diligence to avoid loss or to minimize or lessen the resulting damage, and to the extent that damages are . . . due to his failure to exercise such care and diligence, he cannot recover." *Cook & Nichols, Inc. v. Peat, Marwick, Mitchell & Co.*, 480 S.W.2d 542, 545 (Tenn. Ct. App. 1971).

137.  "The critical factor in determining fulfillment of [the] duty to mitigate is whether the method which [the injured party] employed to avoid consequential injury was reasonable under the circumstances existing at the time." *Tampa Elec. Co.*, 214 F. Supp. at 652.

138.  KSS has not met its burden in demonstrating that Rosenblad failed to mitigate its damages.

139. Based on the backcharge documentation that Yates provided to Rosenblad [Pl. Ex. 47], Yates expended approximately 122 manhours (totaling $9,018.15 [*Id.* at 14], according to the Court's calculation) trying to figure out why the platforms would not fit and trying to actually get the platforms to fit the stripper condensers, before KSS was first apprised of any issues with the platforms on August 10. Yates then expended an additional $2,425.50 on August 12 working with Rosenblad's engineer [*Id.*] to figure out why the platforms would not fit, without any involvement from KSS, and before KSS representatives were asked to go to the Project site.

140. KSS suggests that, had it been notified and involved before the costs were incurred (i.e., immediately after Yates discovered the platforms would not fit), such costs would have been avoided [Doc. 80, p. 23].

141. Based on the backcharge documentation, Yates first observed the platform would not fit to the vessels on July 31 after it attempted (unsuccessfully) to lift it into the air and install it [Pl. Ex. 47]. KSS has failed to prove the costs associated with the first unsuccessful lift could have been avoided.

142. Likewise, KSS has failed to prove the costs associated with Yates's lift efforts on August 1 and 4 reasonably could have been avoided if KSS had been immediately notified and involved. Even with KSS involved, Yates nonetheless may have used the same number of manhours and effort continuing to attempt to fit the platform. Indeed, KSS originally maintained that the parts of the platform were fabricated in strict accordance with the drawings. The Court also observes that KSS ultimately did not furnish what it considered to be the "cost-effective solution" to the

96

problem [Doc. 80, p. 22]—i.e., the channel piece—until more than seven days after Travis Weaver first went to the Project site.

143.    KSS then submits that Yates and Rosenblad further failed to mitigate damages by failing to "employ the recommendations offered by KSS to resolve the issues in a cost-effective manner," to which KSS refers to its furnishing of the channel piece for the stripper condenser platform [*Id.* at 23].

144.    However, Rosenblad's contention is speculation, as there is no evidence that Yates failed to employ KSS's recommendation.   To the contrary, the evidence indicates that the channel piece was not the "simple solution" to the problem as KSS believed it to be [Doc. 79, p. 12; *see also* Pl. Ex. 40; Doc. 75, pp. 96–107].

145.    In light of the above, KSS has not met its burden in proving that Rosenblad failed to mitigate its damages.

**B.    KSS Did Not Violate Tenn. Code Ann. §§ 66-11-135 or 139**

146.    Rosenblad argues that KSS violated Tenn. Code Ann. § 66-11-139 ("Section 139") because KSS willfully and grossly exaggerated the amount for which it claimed a lien on the Project [Doc. 81, p. 20].

147.    Section 139 provides:

> If, *in any proceeding to enforce the lien* . . . , the court finds that any lienor has willfully and grossly exaggerated the amount for which that person claims a lien, as stated in that person's notice of lien or pleading filed, in the discretion of the court, no recovery may be allowed thereon, and the lienor may be liable for any actual expenses incurred by the injured party, including attorneys' fees, as a result of the lienor's exaggeration.

Tenn. Code Ann. § 66-11-139 (emphasis added).

97

148.    Section 139 is inapplicable in this case.

149.    Section 139 applies "in any proceeding to enforce the lien," and it is undisputed that there is no such pending action. *See id.*

150.    Nor does KSS seek to enforce its lien in the present lawsuit (nor could it, because, as discussed *infra*, the lien has expired).

151.    As a result, Rosenblad cannot recover from KSS under Section 139.

152.    In its post-trial briefings, Rosenblad argues, for the first time, that KSS also violated Tenn. Code Ann. § 66-11-135 ("Section 135").

153.    Rosenblad's complaint does not allege a violation of Section 135, and none of its filings before trial mention Section 135.

154.    Aside from Mr. Thelander's testimony [Doc. 74, pp. 111–12] and Mr. Weaver's testimony [Doc. 78, p. 207], which establish that KSS has not enforced or released its lien, Rosenblad did not indicate at trial that it sought to recover from KSS under Section 135.

155.    "The general rule is when issues not raised in pleadings are raised by the express or implied consent of the parties, the court may treat the issue in all respects as if the parties had raised them in the pleadings." *Yellow Freight Sys., Inc. v. Martin*, 954 F.2d 353, 358 (6th Cir. 1992) (citing Fed. R. Civ. P. 15(b)).

156.    However, it is not enough for a party to have introduced evidence relevant to an unpleaded issue. *Kehoe Component Sales Inc. v. Best Lighting Products, Inc.*, 796 F.3d 576, 595 (6th Cir. 2015).

157.    Instead, "[i]t must appear that the parties understood the evidence to be aimed at the unpleaded issue." *Id.*

158.    This is because Federal Rule of Civil Procedure 15(b)(2) requires the opposing party to have notice that the implied claim is being tried against it. *Id.*

159.    Based on the limited evidence elicited on this issue, and in the context of the five-day bench trial that spanned several weeks in which the parties devoted the majority of their time litigating the breach of contract and defective work claims, the Court finds that KSS did not have proper notice to defend itself against this new theory of liability asserted by Rosenblad. *See id.*

160.    Further supporting this finding is that KSS only addressed Rosenblad's Section 139 claim in its post-trial brief, without any mention of Section 135 [Doc. 79, p. 16].

161.    Even if the Court were to find the issue was properly raised, Rosenblad cannot recover from KSS under Section 135.

162.    Tenn. Code Ann. § 66-11-115(b) instructs that a "lien shall continue for the period of ninety (90) days from the date of service of notice in favor of the remote contractor, and until the final termination of any suit for its enforcement properly brought . . . within that period."

163.    KSS never filed a lawsuit to enforce its lien, and as a result, the 90-day period allowed by statute expired on January 14, 2021 [Doc. 82, p. 28]. *See Kalos, LLC v. White House Vill., LLC*, No. 3:20-CV-00812, 2020 WL 7027502, at *3 (M.D. Tenn. Nov. 30, 2020) (interpreting Tenn. Code Ann. § 66-11-115(b)).

99

164. Section 135(a) provides:

If a lienor whose lien has been forfeited, expired, satisfied or adjudged against the lienor in a proceeding on the lien, fails to cause the lien provided by this chapter to be released *within thirty (30) days after service of written notice demanding release*, the lienor shall be liable to the owner for all damages arising therefrom, and costs, including reasonable attorneys' fees, incurred by the owner.

Tenn. Code Ann. § 66-11-135 (emphasis added).

165. "Where the [statutory] language used is devoid of ambiguity, [the court] must apply its plain meaning without a forced interpretation that would limit or expand the statute's scope." *Kyle v. Williams*, 98 S.W.3d 661, 664 (Tenn. 2003) (citation omitted).

166. Section 135 requires that the lien must released "within thirty (30) days *after service of written notice demanding release*," not within 30 days after the lien has expired. *See* § 66-11-135(a) (emphasis added).

167. Put differently, to avoid liability under Section 135, the statute requires the lienor, after the lien has expired, and "within thirty (30) days *after service of written notice demanding release*," to release the lien. *See id.* (emphasis added).

168. Section 135 contemplates the scenario where a lienor has maintained a lien despite the lien having expired and subsequently receives a written demand to release the lien to which the lienor no longer maintains rights.

169. In other words, before Section 135 applies, the written demand must come after the lienor loses its lien rights, not before.

100

170.    KSS was not required to release its lien within 30 days after receipt of Rosenblad's written demand on October 30 because its lien was not yet expired.  *See* § 66-11-135(a).

171.    Section 135 also did not require KSS to release its lien 30 days after January 14, 2021.

172.    Rosenblad's written demand came in October 2020, before KSS's lien expired, and its lien expired in January 2021, after which point, KSS received no written notice demanding release of its lien on account that its lien had expired.

173.    Moreover, Rosenblad submits no authority to support its position that KSS was required to release its lien 30 days after January 14, 2021, and fails to explain the basis for its contention [Doc. 82, p. 28].

174.    Accordingly, KSS is not in violation Section 135 because it did not receive a written demand to release its lien after the lien expired, and Rosenblad cannot recover from KSS on that basis.

### C.    KSS Counterclaim for Breach of Contract and Quantum Meruit

#### i.    Breach of PO-1 and PO-2

In its counterclaim, KSS argues that Rosenblad breached PO-1 and PO-2 by failing to pay KSS the remaining balance on each [Doc. 80, p. 24].  As the Court found *supra*, that amount is $45,421.68, without contemplating backcharges.  In its post-trial briefing, Rosenblad does not address this portion of KSS's counterclaim.

175.   It is undisputed that Rosenblad has not paid KSS in the amount of $45,421.68, which remains outstanding under PO-1 and PO-2, and despite Rosenblad's obligation to do so under PO-1 and PO-2.

176.   Given that Rosenblad has failed to pay such amounts, Rosenblad has breached PO-1 and PO-2, thereby entitling KSS to $45,421.68.

### ii.      Overtime

177.   KSS also contends that Rosenblad is in breach of contract because it failed to pay KSS $15,000 for overtime [Doc. 80, p. 24].  While it is undisputed that the parties never executed a written agreement awarding KSS overtime, KSS contends that Rosenblad waived the provision in PO-1 requiring that any changes to PO-1 be reduced to written change orders and agreed to pay KSS overtime, "as confirmed by a telephone conversation" and the April 22 email [*Id.* at 25–26].  In the alternative, KSS argues that the parties' agreement to pay KSS $15,000 in overtime was implied-in-fact and that the facts and circumstances demonstrate Rosenblad's mutual assent and intent to compensate KSS [*Id.* at 26].

178.   KSS has not met its burden in establishing that the parties modified PO-1 or impliedly entered into a separate agreement by implication, as the evidence does not reflect any manifestation of an intent by Rosenblad to agree to pay KSS $15,000 for overtime.

179.   After a written contract is made, it may be modified by the express words of the parties in writing or by parol, where both parties consent to such modifications.  *In re Estate of Nelson*, No. W2006–00030–COA–R3–CV, 2007 WL 851265, at *18 (Tenn.

102

Ct. App. Mar. 22, 2007) (citing *Galbreath v. Harris*, 811 S.W.2d 88, 91–92 (Tenn. Ct. App. 1990)).

180.  Like a contract, "the modification of an existing contract requires mutuality of assent and meeting of the minds." *Buchholz v. Tenn. Farmers Life Reassurance Co.*, 145 S.W.3d 80, 84 (Tenn. Ct. App. 2003) (citations omitted).

181.  "And a modification of an existing contract cannot arise from an ambiguous course of dealing between the parties from which diverse inferences might reasonably be drawn as to whether the contract remained in its original form or was changed." *Balderacchi v. Ruth*, 36 Tenn. App. 421, 256 S.W.2d 390, 425 (1952).

182.  To determine mutuality of assent, the court must assess "the parties' manifestations according to an objective standard." *Smythe v. Fourth Ave. Church of Christ, Inc.*, No. M2020-01190-COA-R3-CV, 2021 WL 4770249, at *7 (Tenn. Ct. App. Oct. 13, 2021) (citations omitted).

183.  A contract implied in fact is "one that arises under circumstances which show mutual intent or assent to contract." *Thompson v. Hensley*, 136 S.W.3d 925, 930 (Tenn. Ct. App. 2003) (citations and internal quotation marks omitted).

184.  "In a contract implied in fact, the conduct of the parties and the surrounding circumstances show mutual assent to the terms of the contract." *Id.* (citations and internal quotation marks omitted).

185.  KSS first points to the April 17 email from Mr. Lester to Mr. Mackie as evidence of Rosenblad's assent [Def. Ex. 35]. While the email indicated that KSS would

103

work over the weekend, and Rosenblad was aware, neither the email nor the circumstances at the time suggested that KSS would necessarily accrue overtime.

186. Rather, the April 17 email indicates KSS, after working the weekend, would report back and discuss with Rosenblad whether, going forward, overtime would be necessary at all. Indeed, Mr. Lester stated, "If we have seen that . . . there is a need to have an increase in labor costs for overtime, [Mr. Mackie] would talk with his team" [*Id.*]. Such statement does not suggest any meeting or the minds between the parties, as it implies that Mr. Mackie still had to discuss the prospect of overtime, if it was deemed necessary at a future date, with his team.

187. Further, KSS provided Rosenblad no indication of how many hours would be worked by how many individuals or the hourly rate at which it charges overtime. This further casts doubt on Rosenblad's ability to assent to pay KSS overtime without any idea of what would be charged against it.

188. Moreover, that the parties discussed the possibility of overtime does not necessarily mean that Rosenblad intended to be bound by an agreement, either by modifying PO-1 or impliedly, to pay KSS overtime, especially without any estimate beforehand of the potential cost.

189. Finally, the April 17 email does not prove that Rosenblad approved or authorized any overtime KSS accrued over the weekend. Based on the April 17 email, we know only that Rosenblad was aware that KSS was working over the weekend, and that overtime was being contemplated on the Project.

190.    After the weekend, Mr. Lester memorialized his telephone conversation with Mr. Mackie about the schedule and overtime in the April 22 email [*see supra*].

191.    While KSS, in the context of Rosenblad's claim for delay damages, takes the position that the email only reflected "tentative delivery dates" and not a modification to PO-1 [Doc. 78, pp. 79–80], it simultaneously argues the contrary in the context of its counterclaim: that the email is evidence that Rosenblad agreed to pay KSS $15,000 in overtime [*Id.* at 81–82].

192.    In the April 22 email, KSS informed Rosenblad that it "will have about $15,000.00 in overtime [sic], we will talk more on 04/23/2020 will work together to try to resolve" [Pl. Ex. 17].  Such unilateral assertion by KSS does not represent an agreement by Rosenblad to pay KSS $15,000 in overtime or suggest that Rosenblad intended to pay KSS that amount.  Nor does it represent that Rosenblad assented to the charge.  Rather, it was an outstanding issue that the parties needed to resolve.

193.    Further, while Mr. Weaver initially claimed that the parties had a verbal agreement to pay overtime [Doc. 78, p. 216], he later acknowledged that Rosenblad neither agreed nor disagreed to KSS's overtime [*Id.* at 175–76].

194.    His latter testimony was corroborated by Mr. Thelander, who testified that he never approved KSS's overtime.  In addition, there is a lack of evidence in the record demonstrating any intent or mutual assent by Rosenblad agreeing to pay KSS for overtime.

195.    In light of the above, even assuming Rosenblad waived the written change order requirement in PO-1, the Court finds there is no credible evidence demonstrating that the parties modified PO-1 to include payment to KSS for overtime.

196.    While KSS might have subjectively believed that Rosenblad would pay overtime, neither the objective circumstances nor Rosenblad's conduct supports KSS's position that there was an implied agreement between the parties pursuant to which Rosenblad agreed to pay KSS overtime.

197.    In the alternative, KSS argues that it is entitled to recover the $15,000 under the theory of quantum meruit.

198.    "Quantum meruit actions are equitable substitutes for contract claims." *Forrest Const.*, 337 S.W.3d at 227 (internal quotation marks omitted) (quoting *Castelli v. Lien*, 910 S.W.2d 420, 427 (Tenn. Ct. App. 1995)).

199.    A party who has provided goods and services to another may recover the reasonable value of those goods and services when the following five circumstances exist:

(1) there must be no existing, enforceable contract between the parties covering the same subject matter,

(2) the party seeking recovery must prove that it provided valuable goods and services,

(3) the party to be charged must have received the goods and services,

(4) the circumstances must indicate that the parties involved in the transaction should have reasonably understood that the person providing the goods or services expected to be compensated, and

106

(5) the circumstances must also demonstrate that it would be unjust for the party benefitting from the goods or services to retain them without paying for them.

*Id.* at 227 (quoting *Castelli*, 910 S.W.2d at 427 (internal citations omitted)).

200.    The measure of damages for a quantum meruit claim is the actual value of the services provided, not the value of the services to the one who performs the service, *In re Est. of Marks*, 187 S.W.3d 21, 32 (Tenn. Ct. App. 2005) (citing *Mitch Grissim & Assocs. v. Blue Cross Blue Shield of Tenn.*, 114 S.W.3d 531, 537 (Tenn. Ct. App. 2002)); *see also Parris Roofing & Sheetmetal Co. v. SCR Elec., Inc.*, No. E2006-0263-COA-R3-CV, 2007 WL 596396, at *8–9 (Tenn. Ct. App. Feb. 27, 2007), as "[t]he two are obviously not the same." *McGee v. Maynard*, No. 01-A-01-9810-CV-00539, 1999 WL 824298, at *2 (Tenn. Ct. App. Aug. 12, 1999).

201.    Even if KSS makes a claim for quantum meruit, it still must present some proof regarding the reasonable value of the services rendered. *See In re Est. of Marks*, 187 S.W.3d at 33.

202.    The reasonable value of services should be based on the customs and practices prevailing in the same sort of business in which the services would normally be provided. *Id.* (citing *Chisholm v. Western Reserves Oil Co.*, 655 F.2d 94, 96 (6th Cir. 1981)).

203.    Moreover, "[i]n circumstances where it is customary to charge hourly fees, a quantum meruit claim should include evidence regarding: (1) the nature of the services provided, (2) the period during which the services were provided, (3) the number of hours worked, and (4) the hourly rate customarily charged for these services." *Id.*

204.    KSS argues that it is entitled to a judgment for quantum meruit because it incurred $15,000 of overtime with Rosenblad's knowledge and consent [Doc. 78, p. 15]. In support, it cites to the fact that the parties discussed overtime and that Rosenblad knew KSS worked overtime to catch up on the delays and never told KSS it would not pay it overtime [*Id.* at 15–16]. Rosenblad does not address KSS's claim for quantum meruit either in its post-trial briefing.

205.    The Court concludes that KSS has failed to prove the elements of quantum meruit by the preponderance of the evidence.

206.    While Rosenblad was aware that KSS worked over the weekend of April 18 and 19, the evidence does not preponderate a finding that Rosenblad reasonably understood that KSS's work necessitated overtime pay.

207.    As an initial matter, it is unclear how the evidence to which KSS cites in support of this element supports such a finding [Doc. 80, p. 27 (citing Doc. 74, p. 28)].

208.    The April 17 email only indicates that KSS would work over the weekend, after which point, Mr. Lester would report whether overtime would be necessary going forward.    As discussed *supra*, neither the communication nor the circumstances demonstrate that KSS's weekend work necessitated additional pay for overtime hours— only that the parties would discuss whether it was necessary in the future.

209.    Even if KSS could make out a claim for quantum meruit, its claim fails because KSS has not offered any proof that $15,000 is reasonable "based on customs and practices prevailing" in the steel fabrication industry. *See id.*

210. KSS has offered no argument about the reasonableness of its claim for $15,000.

211. KSS offered no proof about whether the value of its services was reasonable according to the customs and practices prevailing in the steel fabrication industry. *See Forrest Const.*, 337 S.W.3d at 228.

212. Mr. Weaver testified only that he believed $15,000 was reasonable because it was lower than what KSS paid out in overtime [Doc. 78, pp. 176–77].

213. The problem with this testimony is the lack of proof to support both the claimed $15,000 and the amount of KSS's expenses. *See McGee v. Maynard*, 1999 WL 824298, at *2. When asked on cross-examination about how KSS calculated the $15,000, Mr. Weaver testified that he could not "say for sure" because Mr. Lester calculated the amount and therefore did not know exactly how it was calculated [Doc. 78, pp. 220–21]. He thought, however, Mr. Lester calculated the hours based on a "guesstimate" of how many man hours it would take" [*Id.*].

214. Based on his testimony, the $15,000 merely reflects KSS's "guesstimate" of the hours worked, as opposed to the actual hours worked. Indeed, there is no evidence that KSS kept a time clock as to the actual hours worked or that the $15,000 reflects the actual hours worked [*Id.*]. Likewise, KSS offered no evidence about the actual number of hours worked, how many individuals were working, or the hourly rate customarily charged for the services. *See id.*

215. Moreover, the Court does not find Mr. Weaver's testimony to be particularly persuasive on this issue given his lack of involvement.

216. As a result, KSS cannot recover on its quantum meruit claim because it has failed to offer proof about the reasonable value of its services.

## V. Conclusion

Based on the foregoing findings of fact and conclusions of law, it is **ORDERED** that:

1. KSS is **LIABLE** for breach of contract for its failure to timely deliver the steel under PO-1, but Rosenblad is not entitled to actual delay damages or liquidated damages;

2. KSS is **LIABLE** for breach of warranty under PO-1 and PO-2 and common law negligence for furnishing defective materials, entitling Rosenblad to damages in the amount of $58,932.67;

3. KSS **DID NOT** violate Tenn. Code Ann. §§ 66-11-135 or 139;

4. Rosenblad is **LIABLE** for breach of contract for its failure to pay KSS for amounts KSS is owed under PO-1 and PO-2 in the amount of $45,421.68; and

5. Rosenblad is **NOT LIABLE** for breach of contract and KSS cannot recover from Rosenblad under a theory of quantum meruit for its failure to pay $15,000 in overtime.

Accordingly, the Court **DIRECTS** the Clerk of Court to **CLOSE** this case.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE

110